**Roger BIRD, Individually and as surviving spouse of Delaine Bird, deceased, Plaintiff–Appellant,**

v.

**UNITED STATES of America, Defendant–Appellee.**

**No. 90–7025.**

United States Court of Appeals, Tenth Circuit.

Nov. 25, 1991.

---

Steven R. Hickman of Frasier & Frasier, Tulsa, Okl., for plaintiff-appellant.

Ralph F. Keen, Asst. U.S. Atty. (John Raley, U.S. Atty., with him on the brief), Muskogee, Okl., for defendant-appellee.

Before SEYMOUR and TACHA, Circuit Judges, and CHRISTENSEN, District Judge.[*]

CHRISTENSEN, Senior District Judge.

This appeal arises from a suit under the Federal Tort Claims Act (FTCA) in which it was alleged that negligence on the part of a certified registered nurse anesthetist (CRNA) as an employee of the government caused the death of Delaine Bird, wife of the plaintiff-appellant Roger Bird.[1] The central issue is whether the CRNA was an employee of the government within the contemplation of the FTCA. The district court in a bench trial held that he was an independent contractor and on that basis denied recovery against the government.

## I.

The issue before us pertains to both coverage and jurisdiction. The FTCA provides a limited waiver of sovereign immunity, *see United States v. Orleans*, 425 U.S. 807, 813, 96 S.Ct. 1971, 1975, 48 L.Ed.2d 390 (1976), and "[t]he terms of the government's consent to be sued define the court's jurisdiction." *Ewell v. United States*, 776 F.2d 246, 248 (10th Cir.1985). The government's consent to be sued under the FTCA extends only to claims against the United States for money damages, for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law or the place where the act or omission occurred. 28 U.S.C. § 1346(b). The consent to be sued does not extend to acts of independent contractors or their employees. *See id.* §§ 1346, 2671. Being of the opinion that at the time in question the CRNA was not an independent contractor but was an employee of the government, we reverse.

## II.

The facts are largely without dispute.

W.W. Hastings Indian Hospital, Tahlequah, Oklahoma, is a full-service hospital generally staffed by its own employees. At the time of the decedent's death, the clinical director of the hospital was Brian Birdwell, M.D., a commissioned officer in the Public Health Service. The chief of surgery, Joel Malobrigo, M.D., was a member of the Public Health Service. He was also head of the hospital's anesthesia services. Prior to Mrs. Bird's hospitalization, there had been a full-time medical doctor anesthesiologist on the hospital staff, but at the time Mrs. Bird was admitted, CRNA David Forsythe, who was also a commissioned officer in the Public Health Service, was the only permanent employee in the anesthesia department. The surgeon operating on Mrs. Bird was Wayne Clairborne, M.D., who was also a government employee.

After the physician-anesthesiologist left, there being more anesthesia work than one person could do, the hospital obtained an additional CRNA through the temporary

[*] A. Sherman Christensen, Senior Judge, United States District Court for the District of Utah, sitting by designation.

1. The nurse Bernard Bullon, the placement service which referred him to the hospital (Jack Grinovich & Associates, Inc.), and the manufacturers of an anesthesia machine (OHMEDA and Ohio Metal Products), were named as third-party defendants and filed cross-claims among themselves. The district court severed the claim of the plaintiff against the government and its employees and certified its judgment of no cause of action as final pursuant to Fed.R.Civ.P. 54(b). No appeal was taken from the trial court's decision exonerating the government's physician employees.

placement services of Jack Grinovich & Associates, Inc. (Grinovich), as had been done on other occasions. The usual procedure was for Grinovich to take a brokerage fee for arranging such services with the government directly paying the anesthetist, but as to the services of nurse Bullon the hospital, apparently for the convenience of writing one check, paid Grinovich a lump sum with the understanding that it would pay the anesthetist.

There was no written agreement between the government and Grinovich except as reflected in requisitions for service of which government's exhibit B–2 is representative:

> Provide anesthesia coverage for surgeries performed on eligible Indian patients of the W.W. Hastings Hospital. This service shall cover 5 days. 5 days [sic] with call back and 2 weekend days during the period of March 28, 1988 through April 11, 1988.[2]

There were written recitations that the government would not be responsible for the negligence of the "contractor"; that the "vendor" would provide his own insurance, and that all equipment would be supplied by the government. The writings did not address the particular nature of the anesthesia coverage to be provided, the status of the person to be supplied for the contemplated surgeries, any standards, guides or directions concerning the performance expected by the government, or any end result to be achieved.

CRNA Bullon considered himself an employee of the Indian hospital and recognized the ultimate authority over him to be the operating surgeon. He testified that his functions, including attire, hours and the like, did not differ from those of the other employees. His authority was that of a nurse anesthetist—to administer anesthesia under supervision. He did not have authority to have someone replace him on any particular day.

State law provided that CRNAs administering anesthesia were to be "under the supervision of and in the immediate presence of a physician licensed to practice medicine," and that violation of this rule was punishable as a misdemeanor.[3] The service had to be "under the direct supervision and control" of a physician to avoid the practice of medicine without a license in violation of state law. 59 O.S. §§ 491–492.[4]

The W.W. Hastings Medical Staff Rules and Regulations contained some similar provisions. They stated under a section on "Relationships–Anesthetist–Surgeon," that anesthesia is "administered under the supervision of the surgeon." In the event of disagreement between the surgeon and the anesthetist, it was provided that the licensed physician would make the final determination. Supervision by the government's medical doctor over the nurse anesthetist was also covered in the Medical Staff Rules and Regulations, as well as in the Policy and Procedure Manual for anesthesia service developed at the hospital. This manual stated, among other things,

---

**2.** The Oklahoma statute authorized CRNAs to perform under supervision of a physician some limited services not directly connected with surgeries and the evidence does not disclose whether Bullon did or did not do so.

**3.** 59 O.S. § 567.51 now provides that a CRNA can "[a]dminister anesthesia under the supervision of a medical doctor, an osteopath physician or a dentist licensed in this state and under conditions in which timely on-site consultation by such doctor, or dentist is available." This provision replaced, effective April 12, 1988—five days after Mrs. Bird's death—a provision that CRNAs who held a registered nurse license could administer "anesthesia under the supervision of and in the immediate presence of a

physician licensed to practice medicine, an osteopath or a dentist." Laws 1976, c. 76 § 1.

**4.** 59 O.S. § 491 provided for a fine of not less than $100 nor more than $500 for the first offense of practicing medicine without a license, and for the second offense imprisonment for not less than 30 days and not more than 180 days. Included in the definition of "practicing medicine," was the treatment "of disease, injury or deformity of persons by any drugs, surgery, manual or mechanical treatment whatsoever." The pertinent exception to this prohibition was "service rendered by a physician's trained assistant, a registered nurse or a licensed practical nurse if such service be rendered under the direct supervision and control of a licensed physician...." *Id.* § 492.

that the "nurse anesthetists are under the overall direction of the surgeon or obstetrician responsible for the patient's care." It required that when anesthesia was administered "a physician must be immediately available in the facility to provide care in the event of a medical emergency."

While there were some differences in detail and interpretation, all of the expert witnesses generally agreed upon the controlling principles.

Dr. Parmley, an anesthesiologist called by the plaintiff, testified that in the absence of an anesthesiologist to head the department the operating surgeon was the one in full charge of the nurse anesthetist; that the nurse didn't have a patient; that the CRNAs worked under the direction of the physician or the operating surgeon. The government's expert witness, Dr. Mayle, testified that anesthesia cannot be administered by a CRNA except under the direction and supervision of the operating surgeon or an anesthesiologist; that if there is a problem concerning the anesthesia, the surgeon's decisions and judgment prevail over the decision of the CRNA. Dr. Clairborne, the operating surgeon, stated his understanding of the law to be that a CRNA must have a physician present in the surgical suite when he administers anesthesia; that the CRNA was "more or less" under the charge of the surgeon and was to follow the instructions of the surgeon "if insisted upon." The Chief of Surgery, Dr. Malobrigo, testified that when a surgery is being performed the CRNA must obey the surgeon.

The evidence shows that apart from the right of control, the practice of control varied depending upon capacities, personalities, competency and other factors. It was indicated that a surgeon working with an anesthesiologist will generally defer to him because of his expertise, and to an extent the same could be said with respect to a nurse anesthetist, but all witnesses were agreed that the surgeon, even in the absence of an anesthesiologist, had the right of control with respect to a nurse practicing under his license. This practical situation is well summarized by the district judge's interrogation of the anesthesiologist Dr. Parmley:

THE COURT: Well, suppose it's an M.D. anesthesiologist. Does the operating physician have any authority to direct him what to do?

THE WITNESS: That's a hard question.

THE COURT: I know. I've heard of a lot of other cases, that's why I ask it.

THE WITNESS: A matter of authority, usually it's done by discussion and there's not a battle for—

THE COURT: Well, if an operation is in progress, it's hardly time for discussion, is it?

THE WITNESS: That's why the surgeon—well, unfortunately, there are times when you have to, but the surgeon will, in medical matters, routinely concede to the expertise of the anesthesiologist in that setting.

THE COURT: All right. So the role is reversed then as far as that particular responsibility is concerned?

THE WITNESS: The role is reversed?

THE COURT: Yes.

THE WITNESS: When there is an—

THE COURT: The anesthesiologist really will then prevail, but in this particular instant [sic], because this is—was a CRNA, the physician, the M.D. has the senior role, in essence?

THE WITNESS: Yes. He's the medical license that the nurse is practicing under.

Transcript pp. 249–250.

### III.

The trial judge made no further comment on his views during the trial, but in written findings of fact filed April 10, 1990, he found in substance that Delaine Bird died at the age of twenty-nine on April 7, 1988, while undergoing a surgical procedure (Caesarian section) performed by Dr. Clairborne at the W.W. Hastings Indian Health Service Facility; that Bernard Bullon, a Certified Registered Nurse Anesthetist, was on duty and was assigned to administer the anesthesia; that Bullon was provided to the hospital by contract between the

United States of America and Jack Grinovich & Associates, Inc.; that soon after the patient arrived in the operating room, Bullon began preparing the patient for surgery and initiated and administered anesthesia; that Bullon did not check out all of the necessary items prior to using the machine as required by standards of nursing anesthesia care; that he admitted that he deviated from the appropriate standards of nursing anesthesia care; that he did not discover prior to the intubation and initiation of anesthesia that there was a misconnection in the breathing circuit; that after he prepared Mrs. Bird for surgery by presedating her with sodium pentothal, paralyzing her with anectine, intubating her and connecting her to the anesthetic machine, he attempted ventilation through the machine and gave the go-ahead for Dr. Clairborne to begin his incision for the Caesarean section but was unable to ventilate the patient, and that afterwards with the help of nurse David Forsythe the machine was properly connected up but that when Bullon pressed the oxygen flush button to deliver oxygen a flush volume at high pressure entered directly into the patient's lungs causing both to rupture and air to escape in the abdominal cavity creating two collapsed lungs under tension or pressure, with cardiopulmonary arrest ultimately causing the death of Delaine Bird as a consequence.

The trial judge exonerated the surgeon, Dr. Clairborne, as well as Dr. Malobrigo, by reason of insufficient evidence of negligence, and concluded that while nurse Bullon was in multiple respects guilty of negligence proximately causing the death of Mrs. Bird, the government was not liable because he was an "independent contractor at all relevant times."

No findings of fact, as such, were made to support the conclusion of law that nurse Bullon was an independent contractor rather than a government employee. But interspersed among reference to *Lurch v. United States*, 719 F.2d 333, 336–37 (10th Cir. 1983), *cert. denied*, 466 U.S. 927, 104 S.Ct. 1710, 80 L.Ed.2d 182 (1984), in the conclusions of law are the following statements which we shall accept as findings of fact for the purposes of this opinion, interpreting them in the light of the undisputed evidence.

No evidence was presented that the Hospital controlled Bullon's day-to-day activities. Indeed, plaintiff adduced evidence that Bullon once left for London while he was on call. If relevant at all, this evidence demonstrates a *lack* [emphasis in original] of control by the Hospital.... In the case at bar, the Government expressly declined to accept responsibility for the contractor's negligence. (Govt's Exh. B–3).

From Conclusion numbered 2.

No evidence of such [affirmative misconduct relating to possible estoppel under *Lurch*] was presented. The testimony of Steven Fastwolf that, in his view, a personal services contract existed between Bullon and the Government, does not rise to this level. There was no contract between the Government and Bullon, but rather between the Government and Grinovich. The Court is aware of Grinovich's testimony that he did not ordinarily pay the employees he provided, but did so in this instance as an accommodation to the Government (Grinovich deposition, p. 18–19). However, this Court's focus must be on day-to-day control, and here the evidence is lacking.

From Conclusion numbered 3.

Appellant has not specifically questioned the foregoing statements of the trial court, and while we do not regard them of substantial significance in light of other undisputed evidence, neither do we consider them clearly erroneous.

### IV.

Under the FTCA the United States is liable for the acts of employees of federal agencies.

"Employee of the government" includes officers or employees of any federal agency ... and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in

the service of the United States, whether with or without compensation.

28 U.S.C. § 2671.

The independent contractor exception is explained by the Supreme Court in *United States v. Orleans:* "A critical element in distinguishing an agency from a contractor is the power of the Federal Government 'to control the detailed physical performance of the contractor.'" *Orleans* at 814, 96 S.Ct. at 1976, quoting *United States v. Logue,* 412 U.S. 521, 528, 93 S.Ct. 2215, 2220, 37 L.Ed.2d 121 (1973).

*Orleans* and *Logue* involved circumstances quite different from those of the present case, but we already have had occasion to apply their principle to alleged medical malpractice issues in *Lurch v. United States,* 719 F.2d 333, *supra,* and *Lilly v. Fieldstone,* 876 F.2d 857 (10th Cir.1989).

We have searched without success among the numerous state and federal cases cited in the briefs, and independently, to find interpretive authority more helpful than *Lurch* and *Fieldstone* in the light of *Orleans* and *Logue* for the purposes of the appeal now before us.

The issue in *Lurch* was the power of "control" over a surgeon employed by the New Mexico School of Medicine but with a contract for service for a Veteran's Administration hospital. This court held that the physician was not an employee of the hospital for the purposes of the FTCA. The case is plainly distinguishable on the facts, but to the extent that its reasoning is applicable, it supports the position of the appellant here.

Judge Holloway, for the Court, relied *inter alia* upon the district court's finding that the VA hospital did not control the manner in which the doctor rendered medical treatment to the plaintiff at the hospital. It was emphasized that a physician's professional ethics require that he have "free and complete exercise of his medical judgment and skill" and that no one else could control the detailed physical performance of his duties. "Given this, by strictly following the traditional control test it is doubtful whether a physician could ever be found to be a federal employee under the

FTCA," Judge Holloway observed, but he added that "such a result would not comport with the Congressional intent" and hence it was logical that some modified or different "control test" should apply with respect to physicians. *Id.* at 337.

However, on the facts before it, the Court concluded that "the contract arrangement itself and its application placed the doctor outside the parameters of an employer-employee relationship with the Government." The contract expressly stipulated that such medical personnel should not be considered VA employees for any purpose. The university provided workman's compensation, insurance, health examinations and social security payments.

Thus, the areas of general supervision of [the doctor's] activity, which plaintiff seems to say should be considered, were confided to the University of New Mexico School of Medicine under the contract arrangement between the V.A. and the University. Because of that contract, which was not a sham, and the working arrangement under it between the V.A. and the University, we conclude that we must hold that the independent contractor exemption from FTCA liability applies. We do so without reaching the troublesome point whether control of the minutiae of medical decisions and procedures should not be considered because they are always reserved to the individual physician. [Footnotes omitted.]

719 F.2d at 338.

In the present case, few, if any, of the factors found determinative in *Lurch* are present. No one contends that Grinovich exercised directly or indirectly any influence, control or review over the performance of nurse Bullon. While the matters of non-liability and insurance were addressed between the government and Grinovich, there was no provision that nurse Bullon should not be considered an employee of the hospital. Insofar as the record before us disclosed there were no legal, professional or ethical considerations that would have warranted him to disregard the control of the operating surgeon on the occasion of Mrs. Bird's death. The record indi-

cates that Grinovich's position bore no resemblance to that of the University in *Lurch,* but was similar to any other employment agency providing references of prospective employees to employers, in this case by form of contract-requisition in a course of practice to meet the special procedural requirements of the government.

Nor are we confronted here with the problem of applying control rationale to physicians who under professional standards must reserve to themselves free from outside control or supervision full responsibility for professional decisions whether employees or independent contractors. On the contrary, the very existence of such a problem with respect to physicians and the contrasting relationship and division of responsibilities between physicians and nurses presage a different result under the circumstances of the present case.

In *Lilly v. Fieldstone,* this court again confronted the issue whether in a malpractice suit a physician was a government employee as the district court had held or, as determined on appeal, an independent contractor of the government hospital which had hired him as a consultant in urology. Finding it unnecessary to adopt in terms a discrete "modified" control test concerning physicians, Judge McKay for the Court observed that the "control test" is subject to a doctor's medical and ethical obligations irrespective of whether the test is labeled "control" or "modified control."

> What we must do in the case of professionals is determine whether other evidence manifests an intent to make the professional an employee subject to other forms of control which are permissible. A myriad of doctors become employees by agreement without surrendering their professional responsibilities. The United States is equally capable of making such an arrangement by express, unambiguous agreement. Our conclusion in this case is that it simply has failed on this record to demonstrate that that was the nature of its agreement with Dr. Fieldstone [the consulting urologist who performed an emergency operation at the government hospital].

*Id.* at 859.

In *Fieldstone,* the following factors convinced the Court that the consulting urologist was an independent contractor. Dr. Fieldstone did not have an arrangement with the hospital whereby he was always required to see patients there. He could refuse to treat a military patient if he wanted to. He was free to see patients at his private office. He billed the Army separately at his standard speciality fee rates. He maintained a private off-base office and had exclusive control over his patients and records. The Army did not furnish him with permanent and private office space or secretarial help at the hospital. He only occasionally used a temporary hospital office when he dictated his operative reports. He did not work under a written contract with the government and was never regularly scheduled on the hospital duty roster, nor did he maintain regular or prescribed office hours as a civilian consultant. The Army controlled little about the end result or the manner and method of reaching a result. While he was subject to the same rules, regulations and hospital control as other military physicians and had limited contact and no control over military patients he treated in emergencies after his work was completed, nothing in the record suggested that this relationship was any different than it would be for a doctor in a private hospital with staff privileges— "[s]urely being subject to hospital's rules as a condition of staff privileges does *not* remotely make a private physician an employee of that hospital." *Id.* at 860. Judge McKay agreed with the trial court that the "control" determination is difficult to make,

> but, on balance, viewing these factors as a whole, we cannot agree that the government "controlled" Dr. Fieldstone enough to render him a government employee. We cannot fairly say that the government "supervise[d] the day-to-day operations" of Dr. Fieldstone. *Lurch,* 719 F.2d at 337.

876 F.2d at 860.

The foregoing enumerated circumstances deemed critical in *Lilly v. Fieldstone*

strongly suggest that the answer must be different with respect to the status of nurse Bullon. In most respects his situation was the antithesis of that of Dr. Fieldstone.

Nurse Bullon was not a physician bound to exercise his judgment independently of a government supervisor. He was not only subject to the rules and regulations and, indeed, a statute placing him under the control and supervision of physician employees of the hospital, but he was under their actual control to the extent they chose to exercise it. He was required to work with patients designated by others. He maintained no separate office. He used hospital equipment exclusively. He could see patients in no other place nor under any other circumstance than as directed by government employees. He was under the control and supervision of the government surgeon at the hospital to the same extent that nurse Forsythe, a regular employee of the government, was.

### V.

The trial court found as a part of its conclusions of law that there was no evidence that the hospital controlled Bullon's day-by-day activities, and that there was no contract between the government and Bullon, but rather it was between the government and Grinovich. Such findings if interpreted in total disregard of the context of the case and the other undisputed evidence might be thought to weigh against an employer-employee relationship. The trial court obviously was referring to the requisition the hospital furnished Grinovich, and obviously could not have meant that Bullon's services at the hospital were somehow apart from any contractual relationship between the hospital and Bullon, whether for service as an independent contractor or an employee. Similarly it should be understood that while there may have been no direct or detailed evidence as to the control of Bullon's day-to-day activities prior to the day of Mrs. Bird's death upon which the evidence was focused, the evidence concerning the preceding period as a whole and on the day in question that Bullon

considered and handled himself as an employee was consistent with the regimen of CRNA Forsythe, a government employee. And of course the trial court could not have meant to question in light of the entire record the continuing effect of the rules and regulations defining the subordinate nature of the authority of nurse anesthetists.

The government further argues that actual control of the nurse's activities was minimal or nonexistent; that Grinovich was under contract to provide nurse support independently; that the same rules apply to employees of independent contractors as apply to their employees and that Grinovich and Bullon are to be treated without distinction; that the only supervision exercised over Bullon's work was the general supervision of the Chief of Anesthesia and the general supervision of the attending surgeon for each individual surgical patient; that Bullon was certified and had special training and expertise in his duties beyond that of the operating surgeons who relied upon him; that the seven prong tests adopted by *Norton v. Murphy*, 661 F.2d 882 (10th Cir.1981), and assertedly approved in *Fieldstone* were either not applicable or require a holding that nurse Bullon was an independent contractor; that the United States is not liable under the general doctrines of *respondeat superior*, loaned servant or estoppel, and that the rules applying to physicians in interpreting the independent contracts exemption should be held to apply to CRNAs. We find none of these arguments persuasive.

*Norton* held that one contracting to deliver mail in a rural area who was involved in an accident with his own vehicle was an independent contractor rather than an employee under the circumstances of that case. While *Fieldstone* cited *Norton* and enumerated its criteria, it did not apply them as such to the case before it in reaching the conclusion that the physician involved there was an independent contractor. On the contrary, the only further reference made to those criteria was to the "first factor in *Norton*, the intent of the parties [which] we are unpersuaded adds anything which illuminates the intent of

the parties on the issue of whether Dr. Fieldstone was an employee or a private contractor." *Id.* 876 F.2d at 859. The same can be said here consistently with a conclusion opposite that reached in *Fieldstone.* The other factors actually considered critical there stand in sharp contrast to the circumstances of the present case, as has already been detailed.

The procurement contract between Grinovich and the hospital was ill designed to control the anesthetist's status. Assuming that Grinovich as designated "vendor" or "contractor" was itself an independent contractor, there was no provision making Bullon an independent contractor. Even though the government disclaimer of liability for the negligence of the contractor, as referred to by the trial court, applied to Bullon, it would be an ineffectual provision as to one otherwise determined to be an employee.

The circumstance that Bullon obtained his position through Grinovich is largely immaterial. It seems clear that a nurse hired directly by the hospital to perform the services Bullon performed would have been an employee rather than an independent contractor for the purposes of the FTCA. The Grinovich interpositioning should not alter our analysis or our conclusion. It is immaterial that Grinovich itself was an independent contractor for the supplying or reference of nurses or other employees to the government. This is not the independent contractor nexus that the FTCA contemplates, although the government's argument tends to confuse the two. The pertinent issue is whether nurse Bullon, himself, was an independent contractor.

The hospital's power to control and supervise, which cannot be gainsaid here, was not diminished by any generality or laxness of that control at particular times. If this were otherwise, added to the recognized difficulty of decision concerning the power of control would be superimposed the day-to-day and perhaps minute-to-minute evaluation of vagaries pertaining to the manner that control was actually exercised, the diligence or inattention of supervising personnel, and other variables which if held to be governing factors would render the application of the control rule almost impossible.

The fact that a nurse has special training certification and skills does not change the situation in light of the circumstances uncontested here that nurse Bullon necessarily worked by virtue of the license and under the supervision and control of a physician employed by the government hospital.

We agree with the government that this is not a case for application of the loaned servant doctrine, nor does that of estoppel apply. Appellant to the contrary cites the loaned employee cases of *United States v. N.A. Degerstrom, Inc.*, 408 F.2d 1130 (9th Cir.1969), and *Martarano v. United States*, 231 F.Supp. 805 (D.Nev.1964). These cases do have tangential bearing not because they demonstrate that Bullon was a borrowed employee, but because the principles they explicate support the conclusion that Bullon was a direct employee under analogous circumstances. *Denton v. Yazoo & M.V.R. Co.*, 284 U.S. 305, 52 S.Ct. 141, 76 L.Ed. 310 (1931), also applying the loaned servant doctrine in different context, emphasizes the "power to control" as the crucial element characterizing the employer-employee relationship. Here there was no employer from whom Bullon was borrowed, nor any competing control. By no stretch of advocatory creativity could Grinovich reasonably be thought to have any control over Bullon as he performed his duties at the government hospital. If Bullon were an employee at all, it would have to be that of the government hospital. The role of employer, or that of independent contractor of Bullon's work, ill suits Grinovich, and the role of independent contractor suits Bullon not at all.

Disregard of these basic considerations would not only misapply the rules laid down by the Supreme Court for differentiation between employees and independent contractors in general and application of the FTCA in particular, but would distort the essential relationships between nurses and physicians in related contexts—relationships that have developed from centu-

ries of experience, that are ingrained in the statutory law, and have become vital to the medical profession in systematically accommodating and utilizing all levels of training, accreditation, skills, responsibilities and power in the public interest. We reject the government's final argument that the same rules of independence should apply to physicians and CRNAs alike.

Some concepts and relationships are inherently implausible—a two-year old yearling, a white blackbird, a plural single, an independent dependent, a certified registered nurse anesthetist serving in a hospital in the circumstances of this case under the license, supervision and control of a surgeon or physician anesthesiologist as an integral part of a government operating team, but at the same time as an independent contractor.

### VI.

In our judgment, CRNA Bullon at the time in question was an employee of the government and not an independent contractor within the contemplation of the FTCA.

With jurisdiction thus founded upon that act, and coverage so established, we RE-VERSE and REMAND for further proceedings consistent with this opinion.