**PUBLISHED**

**UNITED STATES COURT OF APPEALS**

**FOR THE FOURTH CIRCUIT**

JOHN G. ROBB,
Plaintiff-Appellant,

v.                                                              No. 95-1317

UNITED STATES OF AMERICA,
Defendant-Appellee.

Appeal from the United States District Court
for the Eastern District of Virginia, at Norfolk.
Rebecca B. Smith, District Judge.
(CA-94-302)

Argued: January 29, 1996

Decided: March 29, 1996

Before WILKINSON, Chief Judge, HAMILTON, Circuit Judge,
and BLAKE, United States District Judge for the
District of Maryland, sitting by designation.

_____

Affirmed by published opinion. Judge Blake wrote the opinion, in
which Chief Judge Wilkinson and Judge Hamilton joined.

_____

**COUNSEL**

**ARGUED:** Judith M. Cofield, SHUTTLEWORTH, RULOFF,
GIORDANO & KAHLE, P.C., Virginia Beach, Virginia, for Appel-
lant. Anita K. Henry, Assistant United States Attorney, OFFICE OF
THE UNITED STATES ATTORNEY, Norfolk, Virginia, for Appel-
lee.

_____

**OPINION**

BLAKE, District Judge:

Plaintiff-Appellant John Robb ("Robb") appeals from the district court's dismissal of a portion of his Federal Tort Claims Act ("FTCA"), 28 U.S.C. §§ 1346(b), 2671-2680, claim against the United States. Robb argues that the United States is liable for the alleged negligence of two physicians, Doctors John F. Stroy and Richard O'Hagan, who failed to diagnose a cancerous lesion on his lung. Dr. Stroy, a family practitioner, was employed by Franklin, Green, and Jamaludeen, Ltd. ("F.G.J."), a provider of primary care medical services which had entered into a Partnership Memorandum of Understanding ("MOU") with the United States Air Force. Under the MOU, F.G.J. agreed to provide primary care services at the 1st Medical Group, Langley Air Force Base in Langley, Virginia. Dr. O'Hagan, a diagnostic radiologist, was employed by Dr. Leo P. O'Connell. Dr. O'Connell contracted with the Air Force to provide radiology services for the 1st Medical Group. The district court held that Drs. Stroy and O'Hagan were independent contractors with, and not employees of, the United States. Accordingly, it dismissed this portion of Robb's claim against the United States for lack of subject matter jurisdiction. We agree with the conclusion of the district court and affirm.

I.

The facts in this appeal are essentially undisputed. The relationship between the United States and the allegedly negligent physicians may be summarized as follows.

On December 23, 1988, the Air Force entered into an MOU with F.G.J., the employer of Dr. Stroy. Under the MOU, F.G.J. was to provide primary care medical services to CHAMPUS beneficiaries at the 1st Medical Group at Langley Air Force Base.**1** The MOU was to last

_____

**1** The Civilian Health and Medical Program of the Uniformed Service ("CHAMPUS") was established by Congress pursuant to the Dependents' Medical Care Act, 10 U.S.C. § 1071 et seq., to provide medical and dental benefits to dependents of active-duty and former members of the military.

2

two years, but the parties renewed the agreement on July 3, 1990. The renewed agreement remained effective from July 3, 1990 through June 30, 1992. Dr. O'Connell, the employer of Dr. O'Hagan, executed a service contract with the United States Air Force to perform radiology services for the 1st Medical Group at Langley. The contract was in effect from October 1, 1989 through September 1, 1994.

On November 5, 1990, following a fall, Robb received a medical work-up at the F.G.J. Partnership Clinic at Langley Air Force Base at which Dr. John F. Stroy examined Robb and ordered a chest x-ray. Robb's chest was x-rayed the following day, and the film was read and interpreted by Dr. Richard O'Hagan. Dr. O'Hagan failed to locate a mass in Robb's lungs, noting in his report: "The lungs are expanded and free of infiltrate," and "NEGATIVE CHEST."

Over the following three years, Robb was examined by four active-duty military practitioners specializing in ophthalmology, optometry, dermatology, and surgery. The surgeon's examination of Robb was related to pain resulting from gallstones. None of these specialists examined Robb for problems of the neck or lung, and none identified the tumor. On March 24, 1993, Robb commented to an Air Force physician about a lump in his neck. The physician took a chest x-ray and thereafter diagnosed Robb's lung cancer.

On March 16, 1994 Robb filed a complaint in the United States District Court for the Eastern District of Virginia alleging negligence on the part of the United States, its agents and employees. The United States then filed a motion to dismiss and for summary judgment. After briefing and oral argument, a United States Magistrate Judge recommended that the complaint against the United States be dismissed insofar as it alleged negligence on the part of Drs. Stroy and O'Hagan because he determined that the physicians were independent contractors rather than employees of the United States. The magistrate judge recommended denial of the motion for summary judgment with respect to any claims predicated on the acts or omissions of active-duty personnel. In an order dated September 23, 1994, the district judge adopted the magistrate judge's recommendation in its entirety. On February 1-2, 1995, a trial was conducted before the district judge on Robb's remaining claims regarding the alleged negligence of the active-duty personnel. On February 2, 1995, the court granted the

3

United States's motion for judgment as a matter of law regarding the alleged negligence of the active-duty personnel, thus dismissing the remainder of the action on the merits.

Robb has appealed the dismissal of the action against the United States relating to Drs. Stroy and O'Hagan under two theories. First, Robb argues that Drs. Stroy and O'Hagan are employees of the United States and not independent contractors for the purposes of the FTCA. Second, while he does not appeal the judgment of dismissal related to the active-duty personnel, he argues that the alleged negligence of Drs. Stroy and O'Hagan should be imputed to the United States under Virginia's continuing treatment rule. Robb argues that the failure by the active-duty medical practitioners to diagnose his cancer after the original examination by Drs. Stroy and O'Hagan was a continuation of that alleged negligence, and the United States should be liable for that continuing failure to diagnose.

II.

The district court dismissed Robb's claim, to the extent that it relied on the alleged negligence of Drs. Stroy and O'Hagan, for lack of subject matter jurisdiction.[2] Joint Appendix ("J.A.") at 300. The

_____

[2] Where the challenged conduct in an FTCA action was performed by an independent contractor, the district court must dismiss the action for want of subject matter jurisdiction. The jurisdictional grant for FTCA actions provides, in part:

> Subject to the provisions of chapter 171 of this title [Tort claims procedure], the district courts . . . shall have exclusive jurisdiction of civil actions on claims against the United States, for money damages . . . for injury or loss of property, or personal injury or death caused by the negligent or wrongful act or omission of any employee of the Government while acting within the scope of his office or employment, under circumstances where the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred.

28 U.S.C. § 1346(b) (emphasis supplied). See also Williams v. United States, 50 F.3d 299, 304-05 (4th Cir. 1995) (district court has no subject matter jurisdiction to hear FTCA claim arising out of the actions of an independent contractor); Fed. R. Civ. P. 12(b)(1).

4

dismissal of an action under Rule 12(b)(1) is a matter of law reviewed de novo. Williams v. United States, 50 F.3d 299, 304 (4th Cir. 1995); Tillman v. Resolution Trust Corp., 37 F.3d 1032, 1034 (4th Cir. 1994).

The FTCA contains a limited waiver of the United States's sovereign immunity, allowing a plaintiff to sue the United States for damages in compensation for injuries resulting from certain torts of employees of the government acting within the scope of their employment. 28 U.S.C. § 1346(b). An "`[e]mployee of the government' includes officers or employees of any federal agency, members of the military or naval forces of the United States, . . . and persons acting on behalf of a federal agency in an official capacity, temporarily or permanently in the service of the United States." Id. § 2671. The term "federal agency" explicitly excludes "any contractor with the United States." Id. Therefore, Congress has not waived the sovereign immunity of the United States for injuries resulting from the actions of independent contractors performing work for the government. See United States v. Orleans, 425 U.S. 807, 814 (1976).

The FTCA, as a waiver of sovereign immunity, is strictly construed, and all ambiguities are resolved in favor of the sovereign. See United States v. Nordic Village, Inc, 503 U.S. 30, 33 (1992); Williams, 50 F.3d at 305. Accordingly, the independent contractor exception to the waiver of sovereign immunity has been construed broadly. See Lurch v. United States, 719 F.2d 333, 338 (10th Cir. 1983), cert. denied, 466 U.S. 927 (1984). Although state law governs the substantive duties of the United States under the FTCA, 28 U.S.C. § 1346(b), whether a person is a contractor or an employee is determined under federal law. See Logue v. United States, 412 U.S. 521, 528 (1973); Berkman v. United States, 957 F.2d 108, 112 (4th Cir. 1992).

The test employed for distinguishing between a contractor and an employee for FTCA purposes was developed by the Supreme Court in Logue and Orleans. In Logue , a federal prisoner hanged himself while being held in a county jail. The surviving parents of the prisoner sued the United States under the FTCA alleging that the negligence of employees and agents of the government was the proximate cause of their son's death. Logue, 412 U.S. at 522-23. The county jail

5

was one of hundreds that had contracted with the Federal Bureau of Prisons to provide for the safekeeping, care, and subsistence of federal prisoners. The Logue Court concluded that the employees of the county jail were independent contractors and not employees of the United States. In reaching this conclusion, the Court cited approvingly from the opinion of the court below, which had read the FTCA contractor exemption as incorporating the common-law distinction between contractors and employees or agents. Primarily, this distinction turns on "the absence of authority in the principal to control the physical conduct of the contractor in performance of the contract." Id. at 527. Guided by this standard, the Court examined the statute which authorized the contracts with county jails, as well as the contract itself. The Court concluded that the jail was an independent contractor because the United States had no authority to "physically supervise the conduct of the jail's employees." Id. at 530. The Court reached this conclusion despite the jail's obligation to comply with a variety of rules governing prisoner care and discipline, communications with attorneys, visitation privileges, mail, medical services, and employment. The authority of the United States to enter the jail for the purpose of inspection and evaluation did not alter the result. Id. at 529-30.

The Orleans Court built on the principles established in Logue. In Orleans, a father sued the United States under the FTCA for injuries sustained by his minor child in an automobile accident. The accident occurred in a private automobile which was being used by a community action agency to transport children from an outing sponsored by one of its affiliates. The community action agency was funded by the federal Office of Economic Opportunity ("OEO"), was required to comply with federal standards and regulations, conducted only programs formulated and funded by the federal government, and suffered an OEO funding lapse pending the selection of a new chairman of the governing board. Orleans, 425 U.S. at 811. In determining whether the community action agency was a contractor with, or an agent of, the United States, the Orleans court stated that: "the question here is not whether the community action agency receives federal money and must comply with federal standards and regulations, but whether its day-to-day operations are supervised by the Federal Government." Id. at 815. As in Logue, the outcome in Orleans did not turn on the ability of the United States to compel compliance with standards, rules,

6

and regulations. Rather, it was the inability of the OEO to supervise day-to-day operations that led to the conclusion that no employment relationship existed. The Court stated that "[a]lthough such regulations are aimed at assuring compliance with goals, the regulations do not convert the acts of entrepreneurs--or of state governmental bodies--into federal governmental acts." Orleans, 425 U.S. at 816.

This court and others have had occasion to apply the principles of Logue and Orleans to private physicians working under contractual relationships with medical facilities operated by the United States. One of the earliest of these cases was Wood v. Standard Products Co., 671 F.2d 825 (4th Cir. 1982), in which this court was confronted with "the question whether a `contract physician' of the United States Public Health Service (PHS), who had treated medically the plaintiff . . . was an `employee' of the United States, for whose alleged negligence the United States was liable under the [FTCA]." Id. at 826 (footnote omitted). The district court in Wood observed that, because of the nature of their work, physicians can not be subject to external control of their medical judgment. Because no physician may ethically relinquish control of his or her medical judgment, the district court held that the proper application of the Logue and Orleans control test to physicians must focus on "those areas of medical service that may be supervised and controlled." Wood v. United States, 494 F. Supp. 792, 799 (E.D. Va. 1980), rev'd, 761 F.2d 825 (4th Cir. 1982). Specifically, the district court directed its attention to whether the United States "retained and exercised significant authority over the non-treatment areas" of the physician's work. Id. This court rejected the approach of the district court because we found no reason why "the controlling principle as stated in Logue and Orleans is inapplicable to contracts governing the rendering of medical services by a physician." Wood, 671 F.2d at 831. The district court improperly focused its control analysis on "the peripheral, administrative details which were incidental to the rendering of medical services" and not on "the control over the performance of the medical services" as Logue and Orleans require. Id. The Wood court concluded that, when examining the extent of the principal's control over the purported employee, "the real test is control over the primary activity contracted for and not the peripheral, administrative acts relating to such activity." Id. at 832.

7

The Wood court did not conclude, however, that a physician must always be deemed an independent contractor simply because of the necessity that a physician exercise independent professional judgment in providing medical treatment to his or her patients.[3] Nor did the court limit its inquiry to the parties' stipulation "that the PHS . . . does not exercise control over or dictate the day-to-day medical judgment of [the physician] in his provision of medical services." Id. at 830 (internal quotations marks omitted) (emphasis in original). Rather, the court examined a variety of factors relevant to the relationship between the parties.[4] In addition to noting PHS's lack of control of the physician's medical judgment, the Wood court considered: (1) that the physician under the contract was referred to as a "contract physician," (2) that the physician was to provide "outpatient" care, (3) general statements concerning the manner and quality of service required under the contract, (4) the lack of control by the government over the prescription of drugs and medical supplies, (5) the authority of the physician to make referrals, (6) contractual requirements for office hours and the ability of the physician to decline to see patients, (7) the physician's responsibility to provide office space, support staff, supplies, and equipment, (8) the percentage of the physician's total practice which was devoted to activities under the contract, (9) the nature of the compensation to the physician, including method (fee schedule) and rates (similar to the physician's usual fees), (10) PHS recordkeeping requirements, (11) prescribed methods of verifying

_____

[3] For example, physicians may be deemed employees of the government for FTCA purposes because they were hired pursuant to an act of Congress which designates them as such. See e.g. , 38 U.S.C. § 7316 (providing that suit against the United States may be the exclusive remedy for malpractice by physician employees of the government); 38 U.S.C. § 7405 (authorizing the Secretary of Veterans Affairs to "employ" a variety of medical professionals); see also Ezekiel v. Michel, 66 F.3d 894, 903 (7th Cir. 1995) (observing that the application of the strict control test to physicians employed by the government pursuant to § 7316 would, in many cases, defeat Congress's intent to immunize these workers because physicians are typically deemed independent contractors under that test); Quilico v. Kaplan, 749 F.2d 480, 485 (7th Cir. 1984).

[4] In conducting its inquiry, the Wood court noted that "the contract and its terms in fixing the relationship of the offending party are critical," to distinguishing between an independent contractor and an employee. Wood, 671 F.2d at 829.

8

patient eligibility for treatment, and (12) the extent of PHS's review of the physician's offices. Id. at 830 & n.10.**5**

_____

**5** Several of these factors considered by the Wood court are discussed in the Restatement (Second) of Agency § 220(2). Section 220 addresses the liability of a principal for the torts of a servant and provides a helpful discussion of the distinction between a servant and an independent contractor in this context. Section 220(2) provides, in full:

> In determining whether one acting for another is a servant or an independent contractor, the following matters of fact, among others, are considered:
>
> (a) the extent of control which, by the agreement, the master may exercise over the details of the work;
>
> (b) whether or not the one employed is engaged in a distinct occupation or business;
>
> (c) the kind of occupation, with reference to whether, in the locality, the work is usually done under the direction of the employer or by a specialist without supervision;
>
> (d) the skill required in the particular occupation;
>
> (e) whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work;
>
> (f) the length of time for which the person is employed;
>
> (g) the method of payment, whether by the time or by the job;
>
> (h) whether or not the work is a part of the regular business of the employer;
>
> (i) whether or not the parties believe they are creating the relation of master and servant; and
>
> (j) whether the principal is or is not in business.

Restatement (Second) of Agency § 220(2). The Restatement has been cited with approval in other private physician FTCA cases. See Broussard v. United States, 989 F.2d 171, 175 (5th Cir. 1993); Leone v. United States, 910 F.2d 46, 49, 50 (2d Cir. 1990), cert. denied, 499 U.S. 905 (1991).

9

Analyzing these facts, the Wood court had little difficulty in holding that the physician was an independent contractor. Subsequent decisions of the courts of appeals have reached similar results. The circuits have consistently held that physicians either in private practice or associated with an organization under contract to provide medical services to facilities operated by the federal government are independent contractors, and not employees of the government for FTCA purposes. See Carrillo v. United States, 5 F.3d 1302 (9th Cir. 1993); Broussard v. United States, 989 F.2d 171 (5th Cir. 1993); Leone v. United States, 910 F.2d 46 (2d Cir. 1990), cert. denied, 499 U.S. 905 (1991); Lilly v. Fieldstone, 876 F.2d 857 (10th Cir. 1989); Lurch v. United States, 719 F.2d 333 (10th Cir. 1983), cert. denied, 466 U.S. 927 (1984); Bernie v. United States, 712 F.2d 1271 (8th Cir. 1983).

Underlying the uniform results of these cases, however, is some uncertainty regarding the proper test to be applied in FTCA cases involving contract physicians. Robb directs this court to a multi-factored approach discussed in Lilly v. Fieldstone. In Lilly, the Tenth Circuit addressed the concerns about the autonomy of physicians discussed by the district court in Wood and several courts following Wood.[6] Rather than examining the extent of control the government may exercise over medical decisions, the Lilly court stated that the proper course is to identify evidence bearing on the parties' intention "to make the professional an employee subject to other forms of control which are permissible." Lilly, 876 F.2d at 859. The court reasoned that a physician may become an employee by intent and agreement without the requirement that the physician surrender control of vital decisions related to patient care. In attempting to determine the intent of the parties, the Lilly court considered a variety of factors including whether the physician was authorized to see patients at his office as well as at the hospital, whether he charged the same fees to the government and private patients, whether he or the government was the primary supplier of office space and supplies, whether the doctor retained exclusive control over patients and records, whether he

_____

[6] See e.g., Ezekiel, 66 F.3d at 902; Broussard, 989 F.2d at 175; Lurch, 719 F.2d at 337.

10

worked under a contract with the government, and whether he was required to maintain regular office hours as a consultant.**7**

We are not persuaded that there is any need to adopt a test different from that used in Wood for determining the employment status of private physicians in FTCA cases. Indeed, many of the factors considered by the Wood court are substantially similar to the factors discussed in Lilly and the factors outlined in § 220(2) of the Restatement (Second) of Agency.**8** Application of the control test, which properly includes analysis of the contractual relationship between the government and the allegedly negligent physician, is supported by precedent in this circuit and is consistent with the guidance provided by the Supreme Court in Logue and Orleans.

III.

A.

We turn now to the MOU between Dr. Stroy's employer, F.G.J., and the United States. Pursuant to the MOU, F.G.J. was required to provide practitioners and sufficient support personnel "in order to function as a stand alone clinic." J.A. at 34 (MOU ¶ B(2)(n)).

_____

**7** Prior to reviewing the factors it deemed relevant in making the independent contractor determination, the Lilly court noted that the district court in that case had applied a test from Norton v. Murphy, 661 F.2d 882 (10th Cir. 1981). It is this test to which Robb directs our attention. The factors from this test include: (1) the intent of the parties, (2) whether the United States controls only the end result or may also control the manner and method of reaching the result, (3) whether the person uses her own equipment or that of the United States, (4) whether the United States provides liability insurance, (5) whether the United States pays social security tax, (6) whether federal regulations prohibit federal employees from performing such contracts, and (7) whether the individual has authority to subcontract to others. See Lilly, 876 F.2d at 859 (citing Norton, 661 F.2d at 884-85). The court in Lilly did not apply the Norton criteria as such, instead focusing primarily on evidence which manifested the intent of the parties regarding the status of the physician. See Bird v. United States, 949 F.2d 1079, 1086-87 (10th Cir. 1991) (describing the Lilly court's treatment of Norton).
**8** The text of § 220(2) is set forth in note 5, supra.

11

Although located inside the Langley Air Force Hospital, the F.G.J. Clinic was a distinct entity. A sign informed visitors that they were entering the F.G.J. Partnership Clinic, the employees of the Clinic wore civilian clothes and name tags identifying themselves as F.G.J. employees, and no military personnel worked in the clinic. Id. at 49 (Affidavit of Colonel George Belcher, Former Chief of Hospital Services at Langley Air Force Base ("Belcher Aff.")).[9] No F.G.J. employee received any compensation directly from the United States. Id. at 48. Pursuant to the MOU, all compensation to F.G.J. came in the form of CHAMPUS prevailing rate fees. F.G.J. was required to "[p]rovide full professional liability insurance covering acts or omission [sic] of [F.G.J. and any support personnel] not covered by 10 U.S.C. § 1089."[10] Id. at 33 (MOU ¶ B(2)(b)). Finally, it is undisputed that the United States exercised no control over the day-to-day medical judgment of F.G.J. including treatment, diagnosis, and referral for treatment. Id. at 48 (Belcher Aff.).

Robb first argues that the MOU's statement of purpose provides evidence that the parties intended F.G.J. and its employees to be employees of and not independent contractors with the United States.

_____

[9] The district court properly considered the affidavit of Colonel Belcher in ruling on the Rule 12(b)(1) motion. In evaluating whether it has subject matter jurisdiction to hear a case, a district court may consider evidence outside the pleadings. Williams, 50 F.3d at 304.

[10] Paragraph C(7) of the MOU provides in full: "The hospital's liability for actions of its employees (hospital staff and Military Department practitioners, but excluding participating health care entities) is governed by Title 10, United States Code, Section 1089." The "hospital" is shorthand for the 1st Medical Group at Langley Air Force Base, and the term "participating health care entity" includes individual practitioners provided by F.G.J. J.A. 32 (MOU ¶ A(1)).

This liability provision of the MOU refers to the Medical Malpractice Immunity Act, better known as the Gonzales Act. See 10 U.S.C. § 1089. The Gonzales Act provides medical malpractice immunity to medical employees of the armed forces, Department of Defense, Armed Forces Retirement Home, Central Intelligence Agency, and the National Guard if engaged in training or duty. This section makes the FTCA the exclusive remedy for victims of medical malpractice committed by these medical employees of the government.

12

This statement provides: "The purpose of this agreement is to integrate specific Hospital and CHAMPUS program resources to provide primary care services for CHAMPUS beneficiaries at 1st Medical Group, Langley AFB." Id. at 32 (MOU ¶ A(2)). Furthermore, the cover page of the MOU indicates that the Air Force entered into the partnership with F.G.J. "to improve patient access to Primary Care Services at the 1st Medical Group." Id. at 31. We are not persuaded that the Air Force's intention to consolidate resources, and presumably thereby increase the efficiency of health care delivery, suggests that the parties intended that F.G.J.'s employees become employees of the United States. Robb provides no reasons why we should conclude otherwise.

Robb next argues that we should conclude that an employer-employee relationship was created with F.G.J. because it was the government's shortage of medical personnel that required it to seek these services through private contractors. A similar argument was advanced and rejected in Logue. The Logue Court stated: "If this were to be the law, the exclusion of contractors from the definition of `Federal agency' in § 2671 would be virtually meaningless, since it would be a rare situation indeed in which an independent contractor with the Government would be performing tasks that would not otherwise be performed by salaried Government employees." Logue, 412 U.S. at 532.

Robb also suggests that the inability of F.G.J. to subcontract or assign the contract without the prior consent of the government reflects an employer-employee relationship. See J.A. at 34-35 (MOU § (C)(1)). As authority for this proposition, Robb directs our attention to Norton v. Murphy, 661 F.2d 882 (10th Cir. 1981), in which the Tenth Circuit appeared to rely, in part, on a contractor's authority to subcontract to others to support its holding that a driver who had entered into a contract with the United States to deliver the mail was an independent contractor. See id. at 885. While we might imagine cases in which the authority to subcontract supports an inference that an independent contractor relationship exists, we are not persuaded that the absence of authority to subcontract here should give rise to an inference that an employer-employee relationship exists. At most, F.G.J.'s inability to subcontract implies that the Air Force has manifested its consent to receive only the services of F.G.J. However,

13

there is no provision of the contract requiring government approval of F.G.J.'s individual practitioners. Under these facts, therefore, we ascribe little if any weight to this factor in making our determination.

Robb next argues that the review provisions of the MOU authorize the Air Force to control the day-to-day operations of F.G.J. and its employees. The MOU provides that the Medical Group commander shall "[r]eview past and current performance of, determine qualifications of (including review of liability insurance coverage), and select potential participating health care entities." Id. at 32 (MOU ¶ B(1)(a)). Under the MOU, the term "participating health care entity" designates F.G.J. and the individual practitioners provided by F.G.J. Id. at 32 (MOU ¶ A(1)). The authority of the government to review the performance of and determine the qualifications of F.G.J.'s practitioners does not support Robb's position that these physicians were employees of the government. This provision amounts to nothing more than a standard quality assurance clause by which the government reserves the right to determine whether it is satisfied with the services it is purchasing under the contract. As we stated in Berkman, "we cannot accept the suggestion that a contractor loses its independence and becomes an `employee' of the government in every case in which the government writes into the contract sufficient procedural safeguards to ensure compliance with the terms of the agreement." Berkman, 957 F.2d at 114. The other feature of this provision, however, indicates that the Air Force retained the right to "select potential [individual practitioners]" of F.G.J. This type of authority is consistent with an employee-employer relationship. Cf. Broussard , 989 F.2d at 176 (observing that the government did not hire the physician in that case); Lurch, 719 F.2d at 338 (noting that the authority of a university to choose which physicians would fulfill the university's obligations under a contract with the Veteran's Administration was "not consonant with a traditional employer-employee relationship" between the V.A. and the physician). In this case, however, there is no dispute that all F.G.J. employees were selected, hired, and paid at the discretion of F.G.J. J.A. at 46 (Belcher Aff.). It is significant that the Air Force did not specifically request that Dr. Stroy be hired by F.G.J., although it arguably retained the authority to determine who was to work in the clinic.

Robb correctly notes that certain other provisions of the MOU support his argument that Dr. Stroy was an employee of the government.

14

Under the MOU, the Air Force was required to "[p]rovide facilities, diagnostic and therapeutic services, and equipment and supplies necessary for the proper care and management of patients under this agreement to the extent available and authorized for that facility." Id. at 33 (MOU ¶ B(1)(c)). The MOU also required the Air Force to "[p]rovide administrative support to participating health care entities and individual practitioners to the extent available and authorized for that facility." Id. at 33 (MOU ¶ B(1)(d)). The Air Force was also required to provide a nursing liaison "to assist with orientation of Nursing support personnel and insure compliance with[sic] Nursing Quality Assurance Program." Id. at 33 (MOU ¶ B(1)(i)). Moreover, F.G.J. was required under the MOU to "[u]se all available Air Force resources: that is, specialty consultations, other existing partners, ancillary services, and equipment and supplies for the optimal care of patients under this agreement." Id. at 34 (MOU ¶ B(2)(g)). In distinguishing between an employee and an independent contractor, one factor to be considered is "whether the employer or the workman supplies the instrumentalities, tools, and the place of work for the person doing the work." Restatement (Second) of Agency§ 220(2)(e); see also Lilly, 876 F.2d at 860 (independent contractor physician "maintained a private off-base office").

Viewing the entirety of the MOU and the parties' practices under it, however, we conclude that Dr. Stroy was acting as an independent contractor while working for F.G.J. While some provisions of the agreement are consistent with an employment relationship, we can not ignore the clear expression of intent in the MOU to establish an independent contractor relationship. The parties contemplated that F.G.J. would run a "stand alone clinic," albeit with equipment provided by the United States. The employees of F.G.J. were neither selected nor paid directly by the Air Force, and F.G.J.'s compensation was based on CHAMPUS rate fees. Moreover, the Air Force appeared to contemplate that its physicians would be immune from liability under the Gonzales Act, while F.G.J. agreed to provide full insurance coverage for the malpractice of its physicians. These factors, combined with the lack of control over Dr. Stroy's individual medical judgment, are more than sufficient to establish his independent contractor status.

15

B.

In order to determine the potential liability of the United States for the acts and omissions of Dr. O'Hagan, we now turn to the contract between his employer, Dr. O'Connell, and the government. That agreement explicitly provided that the services rendered by Dr. O'Connell would be rendered "in the capacity[of] an independent contractor."[11] Moreover, the contract provided that Dr. O'Connell would be solely liable for any liability producing act or omission by himself, his agents or employees. In a related provision, the contract required Dr. O'Connell to maintain at least $1,000,000 of insurance for liabilities incurred while performing the contract. J.A. at 52 (Service Contract, Part I, ¶ 5). All employees of Dr. O'Connell were "selected, hired and paid at the discretion of Leo. P. O'Connell," without receiving any compensation directly from the Air Force. Finally, the United States exercised no control over day-to-day activities related to interpreting radiologic film. Id. at 48-49 (Belcher Aff.).

The only arguably significant element of control over Dr. O'Connell came in the form of an oversight provision pursuant to which the Air Force reserved the right to "evaluate both [the] quality of professional and administrative services rendered, including, for example, the professional judgements, [sic] diagnosis [sic] or specific medical treatments." Id. at 52 (Service Contract, Part I, ¶ 5). Robb cites this provision as evidence that the Air Force has reserved the right to control the exercise of professional judgment of Drs. O'Connell and O'Hagan thereby creating an employer-employee relationship. This interpretation is misguided for two reasons. First, the

_____

[11] While not dispositive of the matter, this provision demonstrates that the parties did not believe an employer-employee relationship was created by the contract. See Restatement (Second) of Agency § 220(2)(i) (relevant to distinguishing between an employee and an independent contractor is "whether or not the parties believe they are creating the relation of master and servant"); see also Lilly, 876 F.2d at 859 (discussing the intent of the parties to create an independent contractor relationship); Kramer v. United States, 843 F. Supp. 1066, 1072 (E.D. Va. 1994) (discussing intent of the parties and the right of the government to receive the benefit of its bargain in shifting the risk of loss from itself to the doctor).

16

authority reserved to the Air Force is the right "to evaluate [the] quality of . . . services rendered," not the right to control the professional decisions of the physicians. This provision, like the one contained in the MOU with F.G.J. discussed above, is merely a quality assurance clause not inconsistent with the conclusion that Dr. O'Connell is an independent contractor. Second, the cited language must be viewed in context. The passage isolated by Robb appears immediately following the passage which provides that "the services rendered by the physician are rendered in the capacity [of] an independent contractor," and immediately preceding the passage which states that "[t]he contractor shall be solely liable for any liability producing act or omission, by [sic] contractor, its agents, or employees, and expressly agrees to indemnify the government against all liability or loss." Id.

Robb next argues that evidence of control by the government may be inferred from the provision of the service contract requiring Dr. O'Connell "to return all films and examination[sic] to the MTF [Medical Treatment Facility] where they will remain the property of, and subject to the exclusive control of the U.S. Government." Id. at 53 (Service Contract, Part II, ¶ 7). Far from providing evidence of control, this provision, if anything, supports the government's position that Dr. O'Connell's practice is separate and distinct from the Air Force.

Robb points out that the government was required to provide certain equipment and services for the performance of Dr. O'Connell's duties under the contract, suggesting the existence of an employer-employee relationship. The provisions of the contract cited by Robb indicate that the government agreed to provide use of the radiology department, office space and associated equipment, a variety of support personnel services, forms, and office supplies. Id. at 54 (Service Contract, Part IV, ¶¶ 1-5)). Robb, however, fails to cite an earlier portion of the contract which provides that Dr. O'Connell was required to "furnish[ ] all labor, transportation, consultation, teaching report, [sic] equipment, material, supplies, and supervision except as noted in PART IV." Id. at 52 (Service Contract, Part I, ¶ 1). Read together, this allocation of resources supports the government's position that Dr. O'Connell and his staff were providing services as independent contractors. The Air Force was required to make available a radiology facility and some associated resources, but Dr. O'Connell agreed to

17

provide all other "equipment, material, and supplies" to perform his services. See Restatement (Second) of Agency§ 220(2)(e). Furthermore, it is uncontroverted that, while the contract authorized Dr. O'Connell's access to the Langley facility for film reading, this rarely if ever happened. J.A. at 49 (Belcher Aff.).

Finally, Robb argues that the explicit reservation of the right of the government to refer patients to civilian practitioners is evidence that Dr.O'Connell was an employee of the government. Again, if relevant at all, this factor appears to favor the government's position. Rather than showing that the government controlled the professional judgment of Dr. O'Connell, this provision is an example of an area in which the government has withheld discretionary authority and, to that extent, obviated the need for supervision.

We conclude that Dr. O'Hagan was acting as an independent contractor while working for Dr. O'Connell under the service contract with the Air Force. The contract explicitly identified Dr. O'Connell as an independent contractor, Dr. O'Connell agreed to assume sole liability for the acts and omissions of himself and his employees, and Dr. O'Connell was required to buy liability insurance to cover the risk he assumed. Dr. O'Connell selected and paid Dr. O'Hagan directly, he was required to provide most of the necessary equipment for performing under the contract, and almost none of the film reading occurred at the Langley facility. As with Dr. Stroy, the combination of these factors and the government's lack of control over Dr. O'Hagan's daily medical judgments render him an independent contractor.

IV.

Robb argues that, even if Drs. Stroy and O'Hagan are independent contractors, the United States should be held liable for their alleged negligence pursuant to Virginia's continuing treatment rule. The continuing treatment rule, under Virginia law, tolls the two-year statute of limitations in certain malpractice actions. Under the rule, the statute of limitations begins to run, not at the time of the initial act of malpractice, but rather at the termination of a substantially uninterrupted course of improper examination or treatment by the same physician for the same or a related illness or injury. See Grubbs v. Rawls,

18

235 Va. 607, 369 S.E.2d 683 (1988); Farley v. Goode, 219 Va. 969, 252 S.E.2d 594 (1979).

Robb's reliance on this doctrine is misplaced. There is no suggestion in this case that Robb's claim was time barred. Rather, Robb is attempting to attribute negligence to the active-duty personnel who had no connection with the initial act of alleged negligence. Moreover, Robb has not appealed the district court's judgment finding no negligence on the part of the active-duty personnel. The doctrine of continuing treatment is simply not applicable to the facts of this case.[12]

V.

For the foregoing reasons, the order of the district court granting the government's motion to dismiss for lack of subject matter jurisdiction is

AFFIRMED.

_____

[12] Robb alleges that "at no time did [he] know (or have any way of knowing) whether a contractor or an active duty physician was assigned to treat [him]." By this we take Robb to be arguing that the government is equitably estopped from denying liability for the actions of F.G.J. In light of the facts set forth elsewhere in this opinion and Robb's failure to allege even a single act of affirmative misconduct on the part of the government we reject this claim. See United States v. Agubata, 60 F.3d 1081, 1083 (4th Cir. 1995), cert. denied, ___ U.S. ___, 1995 WL 647999 (U.S. Feb. 20, 1996); Kramer, 843 F. Supp. at 1072-73.