Betty C. SMITH and Rudolph Smith, Plaintiffs,

v.

UNITED STATES of America, Defendant.

No. Civ.A. 9:97–3592–8.

United States District Court,
D. South Carolina,
Beaufort Division.

June 5, 2000.

John E. Parker, Peters Murdaugh Parker Eltzroth and Detrick, Hampton, SC, for Plaintiffs.

John H. Douglas, U.S. Atty.'s Office, Charleston, SC, for Defendant.

## ORDER

BLATT, District Judge.

### INTRODUCTION

The Plaintiffs filed this action pursuant to the Federal Tort Claims Act, 28 U.S.C. § 2671, et seq., against the Defendant based upon the alleged negligence of certain employees of the Beaufort Naval Hospital. The claim arose when Mrs. Betty Smith had a mammogram at the Beaufort Naval Hospital on May 5, 1994, which indicated an abnormality, but neither she nor the requesting physician were notified of that result until five months and twenty-seven days later, on November 1, 1994.

Mrs. Smith's negligence claims are based upon several alleged acts or omissions by the hospital employees. This Court summarizes her allegations as follows: (1) the hospital failed to have an adequate procedure in place for delivery of radiological reports during the transition phase from hand delivery to computers that would ensure that physicians ordering radiological reports would timely receive the results; (2) on April 18, 1994, when the radiology department began entering test results into the computer and discontinued a written multi-part form report, the hospital employees in charge of the transition did not inform Dr. Sherbert, the radiologist, that all physicians were not yet on the computer system; (3) the hospital should have required radiologists to keep a log of their phone calls to requesting physicians of abnormal test results; (4) the hospital employees failed to notice and correct the print-out failure that occurred on or around May 5, 1994, when Mrs. Smith's report was not printed in the Family Medicine Clinic; (5) the radiology technician should have coded Mrs. Smith's report as "abnormal," instead of "see report text," and during the transition phase the hospital procedure should have included periodi-

cally creating computer audit trail reports to determine which abnormal results in the computer had not been "opened and read;" and when that occurred hospital employees should have telephoned the requesting physicians to make sure they knew of those abnormal results; (6) the employees of the Radiology Department failed to manually print Mrs. Smith's May 5, 1994, test result and place it in the file kept in the Radiology Department; and (7) the radiology staff should not have informed Mrs. Smith that if she did not hear anything in three to four days she could assume her May 5, 1994, mammogram was normal, and the hospital should have had a procedure in place in 1994 to directly notify patients concerning their mammogram results. Mr. Smith's claim is for loss of consortium.

This case was tried non-jury by this Court on February 4 and 5, 1999. After reviewing the trial transcript, this Court determined that it would be helpful to have testimony from a hospital administrator, or some other knowledgeable person, on the issue of whether the hospital's procedure for relaying radiology test results to requesting physicians during the transition phase to computers was a deviation from standard hospital practice, and whether that procedure would have been utilized by a hospital using due care. There had been no testimony presented at the trial on those issues, and the parties had not developed any such evidence.

The Court gave the parties time to locate such witnesses and take their depositions, which was done. After the transcripts of the new evidence were prepared, the parties notified the Court that they had agreed to submit the depositions for the Court's review in lieu of the Court hearing live testimony from those witnesses. The new witnesses included Melissa Jarriel, Kimberly Stavrinakis, and Kathryn L. Brownlee. This Court has now reviewed the additional deposition testimony, the trial transcript, the transcript of oral argument, and the relevant legal authorities, and this action is now ready for disposition.

Pursuant to Federal Rule of Civil Procedure 52, this Court makes the following findings of fact and conclusions of law, and it ultimately concludes that the United States is entitled to judgment in its favor.

## FINDINGS OF FACT

1. Betty Smith is the wife of Rudolph Smith, who retired from the military. Mrs. Smith was entitled to and did receive routine medical care, including mammograms, at the Beaufort Naval Hospital, Beaufort, South Carolina, which hospital is the responsibility of the United States of America.

2. Dr. George Gilbert, an employee of Military Partnerships, Inc., was Betty Smith's family physician, at the Family Medicine Clinic. Dr. Gilbert ordered a routine yearly mammogram for Mrs. Smith on January 31, 1994. Because the mammography equipment at the Beaufort Naval Hospital was not operational, the mammogram was not performed until May 5, 1994. Mrs. Smith's last mammogram had been performed in 1993, and it had been reported as normal.

3. Dr. Gilbert was not an employee or agent of the United States, nor were the staff employees who worked in the Family Medicine Clinic.

4. Mrs. Smith stated that on May 5, 1994, "they" told her that they would send the results of the mammogram to her physician and if she did not hear anything within three to four days she could assume it was normal.

5. On May 5, 1994, Mrs. Smith's mammogram film was interpreted by Dr. T. Ray Sherbert, a radiologist, as showing a "suspicious mass" in the nine o'clock position in her right breast. Dr. Sherbert dictated a report of these results, and it was transcribed into the hospital's new computerized Composite Health Care System ("CHCS") at 12:07 p.m. on the day of the mammogram. The report of Mrs.

Smith's mammogram results was approved by Dr. Sherbert at 12:10 p.m. on May 5, 1994, as shown in the CHCS records. Dr. Sherbert testified that he felt fairly certain that he would have personally verified Mrs. Smith's May 5, 1994, mammography report because it was a major abnormality, and he stated that it was his responsibility to dictate the text of the report and the result code, not the radiology technicians' responsibility. He further testified that Mrs. Smith's report was coded "see report text," but he does not know why it was coded in that manner because it should have been coded "abnormal," and that he could not say for sure that he told the transcriptionist to code it "abnormal."

6. Dr. Sherbert was employed by Beaufort Radiology Services; he was not an employee or agent of the United States; however, the radiology technicians and transcriptionists were employees or agents of the United States.

7. Beaufort Naval Hospital Instruction 6510.3D reads "(a)ny abnormal findings by the Radiologist will be phoned to the ordering provider by the Radiologist or staff technologist." This Instruction was in place in May of 1994. As originally issued, this Instruction contained a requirement that "[t]he abnormal finding and phone call shall be logged at the time it is given to the requesting provider." However, the requirement for the radiologist to log the abnormal finding and phone call had been eliminated by a change to the Instruction prior to May of 1994. Dr. Sherbert was required by Beaufort Naval Hospital to comply with hospital instructions.

8. Mrs. Smith did not hear further about the May 5, 1994, mammogram and she thought the mammogram was normal. In October, 1994, while doing a self-examination of her breast she discovered a lump there. She called and made an appointment to see Dr. Gilbert, and she saw him on November 1, 1994.

9. On November 1, 1994, Dr. Gilbert, after examining Mrs. Smith and finding the lump in Mrs. Smith's breast, told her that he had not heard anything from the results of the mammogram he had ordered in January, 1994, and which she had completed on May 5, 1994. In Mrs. Smith's presence, Dr. Gilbert located the May 5, 1994, mammogram report on his computer terminal. The May 5, 1994, mammogram report stated: "Comparison with exam of 3/2/93 nodular density with irregular borders has developed at breast in 9 o'clock position (1.5 × 1.2 cm's). Rec. needle localization and biopsy." Mrs. Smith felt devastated, and her immediate thought was that she was going to die. She became hysterical and her husband traveled to Beaufort to comfort her. According to Dr. Gilbert, he had never received the May 5, 1994, abnormal mammogram report or heard anything about it until he found it himself on the computer terminal on November 1, 1994.

10. Dr. Gilbert ordered another mammogram on November 1, 1994, and it was read that "the lesion has irregular borders and measures approximately 2 cm in greatest diameter and is highly suspicious for carcinoma." Needle localization and biopsy were again recommended.

11. Dr. Tim Pearce, a surgeon, performed the biopsy and after examination of the two lesions removed during surgery, a pathologist concluded the tumors were ductal infiltrating carcinoma. Dr. Pearce recommended a modified radical mastectomy but because Mrs. Smith was interested in breast conservation, he referred her to Dr. Dent Purcell, a radiation oncologist. Dr. Purcell concluded that Mrs. Smith could be treated with a lumpectomy, chemotherapy, and radiation treatment.

12. On November 22, 1994, Mrs. Smith had the lumpectomy and had the lymph nodes of the arm pit removed. Of twelve lymph nodes removed, four of the deep axillar nodes contained cancerous tumors which had metastasized from the breast tumor.

13. Mrs. Smith completed the chemotherapy and radiation therapy and had not

been diagnosed with a recurrence of the cancer when all the evidence was submitted to the Court.

14. Dr. Sherbert testified that upon reading the abnormal mammogram on May 5, 1994, he called Dr. Gilbert at the Family Medicine Clinic to report the results to Dr. Gilbert, but Dr. Gilbert was not there. Dr. Sherbert told the staff person to whom he spoke that he needed to talk to Dr. Gilbert about the abnormal mammogram, but was told Dr. Gilbert would be out of the clinic for a few days. Dr. Sherbert testified that he told the person at the clinic that Dr. Gilbert would be getting the report through the computer system and that it was important for him to contact Dr. Sherbert. Dr. Sherbert stated that in May of 1994 he did not know that certain physicians were not on the computer system and had he known that Dr. Gilbert was not yet trained on the computer system, he would have again made a special point to contact Dr. Gilbert personally regarding the abnormal finding. Dr. Gilbert testified that upon learning of the incident, he spoke with Dr. Sherbert to inquire why he had not received the May 5, 1994, mammogram result, and Dr. Sherbert said that he had just forgotten to call Dr. Gilbert personally.

15. The Composite Health Care System ("CHCS") computerized record system was installed at Beaufort Naval Hospital by a private contractor, Science Applications International Corporation ("SAIC"), in early 1994. Dr. Gilbert received a formal four hour training on "Results Retrieval" on June 1, 1994. By Dr. Gilbert's own admission, he was not adept with computers.

16. When SAIC installed the computer system in the Radiology Department, employees of the contractor trained Dr. Sherbert in the proper use of the computer system for reporting the results of radiological examinations. Dr. Sherbert confessed that he was uncomfortable with computers and that he was not computer literate.

17. Prior to CHCS, radiological tests were ordered by a doctor in the hospital's clinics by writing his request on the top sheet of a multi-part printed form. The doctor's writing printed his request directly through the top sheet onto the other sheets of the form. The form was then manually carried to the Radiology Department. After the test, the radiologist wrote down the results on the top sheet of the form; then the three parts of the completed form were separated: one part was kept in Radiology (for future reference if another x-ray were to be done of the same area of the patient), one part was sent to Outpatient Medical Records to be placed in the patient's permanent record file for future reference, and one part was picked up by the clinic that had requested the test, to be distributed to the particular doctor who had ordered the test, so that doctor could be advised of the results. The person from a clinic, such as the Family Medicine Clinic, who picked up the forms from the Radiology Department was required to sign a log that such person had obtained these reports. If a test result had been abnormal, the requesting doctor should have already been telephoned by the radiologist. For normal results, however, this manual delivery of the written form was the only method of notification to the requesting doctor, until the advent of CHCS. Under the pre-computer system, the Radiology Department had no method of verification that the written report—whether for abnormal or normal results—had actually been received by the doctor who had requested the test.

18. The Radiology Department began replacing the written, multi-part form reporting system by entering examination results into the CHCS computer system on April 18, 1994. The transition phase from the written, multi-part form system to the computer system began on April 18, 1994, and lasted until some time after November 2, 1994; therefore, Mrs. Smith's May 5, 1994, mammogram occurred during the transition phase.

19. In addition to the on-line computer record of the test results, during May, 1994,—the transition phase—there were three copies printed of all radiology reports. The CHCS computer system was programmed to automatically print one copy of the test results in the Outpatient Medical Records department. The system permitted additional automatic printings to be scheduled, and the Radiology Department elected to have the system automatically print another copy of the test results with the requesting clinics. Therefore, at a predetermined time each day all pending test results were printed in Outpatient Medical Records and, at a different predetermined time each day, copies of all pending test results that had been ordered by doctors in the Family Medicine Clinic would be printed directly to that clinic's printer. Radiology had no way of knowing if the providers did not receive a hard copy of the report from the automatic computer printouts; it was dependent upon the clinic that expected to receive test results to call and complain that the results had not printed. In addition to these automatic report printings, each night the radiology technician on duty manually printed one copy of each report for which the film had not been filed; the technician then placed that printed copy of the report in the film jacket with the film for storage in the Radiology Department files, for reference by the Radiologist in comparing that x-ray with any future, similar x-ray. The copies that were printed in Radiology and Outpatient Medical Records played no role in communicating results to the doctor who had ordered the test.

20. To summarize the records delivery procedure, on April 18, 1994, the day the hospital began its transition phase to the CHCS computer system, the method of sending one part of the written, multi-part form back to the requesting doctor was discontinued and replaced by two methods for reporting normal results. Both of these two new notification methods resulted automatically from the Radiology Department's posting and verifying the test results on the computer system. First, once any test results had been verified on CHCS, the requesting doctor would thereafter be notified whenever he logged onto the computer system that he had pending test results, and the computer would continue to advise him of those pending results whenever he logged onto the system until he read the results and electronically "signed" them. Secondly, as an interim measure (since not all doctors could be immediately trained on retrieving test results from CHCS), CHCS was programmed so that once a day it checked to see which of each clinic's test results had been both transcribed into CHCS and approved by the radiologist, and all of those test results that were ready to be reported would be printed on a printer located in the appropriate clinic. This printing of the report in the clinics was an interim transition reporting method; at some point after the health care providers had been trained on CHCS and had been ordered to use it, the printing of reports in the clinics was discontinued.

21. To summarize the records delivery procedure for reporting abnormal results, the primary method of reporting results during the transition phase was still the mandatory direct telephone contact that was supposed to be made by the radiologist to the requesting doctor to immediately advise the requesting doctor of the abnormal findings. In addition, for all radiology test results which the radiologist had coded as "abnormal," CHCS would automatically generate an email message to the requesting doctor advising him that he had an abnormal test result that needed attention. This was in addition to the general notification of pending test results the doctor would get whenever he logged on to his computer, and it helped direct the doctor's attention to the abnormal results. Of course, the email message "abnormal" could only be delivered to doctors who had both been trained and were actively using the computer system. The requesting physicians—whether they

utilized the computer or not—would also automatically receive a print-out copy of abnormal test results from the printer located in their clinics once a day.

22. Mr. Freeman, who described himself as the Leading Chief of Radiology when he was employed at the Beaufort Naval Hospital during May of 1994, testified that the proper result code (ie. "abnormal" or "see report text") was supposed to come from the radiologist at the time he dictated the report, which the transcriptionist would later transcribe. He stated that the radiologist made the decision as to what result code to place on a report.

23. Both parties agreed that there is no evidence that a copy of Mrs. Smith's May 5, 1994, mammogram was printed in the Family Medicine Clinic or in Outpatient Records on or around May 5, 1994. In fact, it appears that the first time that report was printed was on November 1, 1994, by Dr. Gilbert. Why this happened, assuming it actually happened, is unknown, but the fact that the print apparently failed in two separate locations would indicate that this was most likely some form of software malfunction; it would have been unlikely that both the Family Medicine Clinic and Outpatient Medical Records would have had printer problems at the same time. There was no evidence to show that any other print failures occurred on May 5, 1994. Mr. Freeman testified that the only explanation that would be consistent with the described failure would be a software failure on the part of the computer system. In its closing argument, the United States conceded that the evidence shows that the cause of Mrs. Smith's May 5, 1994, mammogram report not being printed was most likely a system failure due to the fact that it did not print in two different locations.

24. The hospital experienced a few problems with CHCS during the first six to eight months the system was used. There were occasions when radiology reports which the system was designed to print at the clinics would not be printed;

for example, when the software had been updated by SAIC, or when one of the clinics failed to set up its printer properly—by improperly feeding the paper into the printer. Mr. Swartz, who was a radiology technician at Beaufort Naval Hospital in May, 1994, estimated that he knew of only five or six print failures during the first year of operation of the CHCS computer system. There was no testimony or any other evidence presented that any of the print failures that occurred during the first year of CHCS operation occurred during the period between April 18, 1994—when the Radiology Department began using CHCS—and May 5, 1994—when Mrs. Smith's mammogram was performed and her results posted on CHCS. Employees of the defendant promptly repaired any problems with the printing when they occurred. Mr. Swartz also testified that when a technician was notified of a print failure, and then repaired the system, he thereafter determined which reports were not printed and ensured that all such reports were then properly printed.

25. Because Dr. Gilbert was not trained on the computer in May, 1994, he would have been limited to three avenues for receiving the results at issue in this case: (1) the telephone call he should have received from Dr. Sherbert; (2) the report that should have been automatically printed by the computer in the Family Medicine Clinic; and (3) a response to any inquiry by him or his staff concerning the results of the test.

26. There was no evidence presented at trial that anyone from the Family Medicine Clinic ever contacted the Radiology Department to inquire about the results of the test. Dr. Gilbert testified that there was no system maintained in the Family Medicine Clinic to track requests for radiological studies to ensure that the tests were performed and the results were reported back to the Clinic. By contrast, Dr. Gary Thomas, Mrs. Smith's medical oncologist, testified that his office maintained a system to check to make sure that

any mammograms he ordered were completed and the results returned to him.

27. On November 1, 1994, the day it was discovered that Mrs. Smith's May 5, 1994, mammogram report had not been relayed to Dr. Gilbert, a number of people, including Dr. Sherbert and the commanding officer of the hospital, became very interested in Mrs. Smith's case. All were very shocked. On November 2, 1994, the hospital commander issued an order that, "in order to expose and correct problems inherent to CHCS, it is essential for all providers who are trained on the system use it. To date, all but fourteen providers have been trained."

28. At trial, the Plaintiffs attempted to elicit expert opinion regarding the hospital's records delivery procedures from Dr. Gilbert. While he stated that on May 5, 1994, the hospital did not have appropriate procedures in place to ensure that physicians would receive radiology reports simply because he did not receive a formal copy of Mrs. Smith's report, and that the hospital should not have discontinued sending the written, multi-part forms because many physicians were not on the computer, Dr. Gilbert was a family medicine physician with no expertise in proper utilization of computers in transmitting medical records, nor did he have any expertise in hospital administration. In his own words, he "wasn't very adept" in the use of computers. Moreover, Dr. Gilbert's failure to himself check for the report of the test on Mrs. Smith more than likely "flavored" his opinion.

29. Dr. Gilbert testified that the hospital in 1994 should have had a procedure to send patients a card directly to notify them of their mammogram results; however, on cross-examination, he admitted that he was not offering an opinion that the hospital deviated from accepted medical standards in 1994 by failing to mail cards directly to patients. When asked if he had ever advised patients to assume their mammogram was normal if they had not heard anything in three to four days, Dr.

Gilbert stated "no;" when asked "would that be a deviation from accepted medical standard to advise a patient of that?" he answered "in my opinion."

30. The Plaintiffs also attempted to elicit expert opinion regarding the hospital's records delivery procedures from Dr. Sherbert. He stated that the hospital's transition to the new computer system had problems because the people using the computers had not been adequately trained. Dr. Sherbert testified it was his opinion that in 1994 the Radiology Department should have required a log of major abnormalities, and that it did not have such a policy. On cross-examination, he admitted that if the hospital had maintained a log in 1994, he would have signed it indicating that he had complied with the hospital policy of telephoning the requesting doctor and he would have written down the name of the person he talked to in the Family Medicine Clinic. He further stated that in his opinion in 1994 the hospital should have had a policy whereby the requesting physician would have to sign off upon receipt of radiology reports. Like Dr. Gilbert, Dr. Sherbert, a radiologist, had no experience in regard to proper utilization of computers in support of medical records delivery, and he did not establish himself as an expert in hospital administration. Dr. Sherbert testified that he was not "computer literate," that he was "never very comfortable working with computers," and that he relied on his radiology technical staff in regard to the capabilities of the computer system. His failure to personally speak with Dr. Gilbert, as the rules of the hospital required, more than likely "flavored" his testimony, too.

31. Dr. Sherbert also testified that in 1994, there was no procedure at Beaufort Naval Hospital to send mammography results to patients directly. When asked if there should have been such a procedure, he stated that after the Mammography Quality Standard Act was passed it was mandated by the government to do so and

it is an excellent policy. He believed that the Act passed in 1995, and everything changed after that date.

32. Kathryn L. Brownlee, who was the Radiology Department Supervisor at Beaufort Memorial Hospital in 1994, testified by deposition, pursuant to the parties' agreement. The Beaufort Memorial Hospital Radiology Department transitioned to a computer system in 1991; after that, only doctors who had a "Meditech" system in their office could access a radiology test result on the computer. She explained that not all doctors on staff who ordered radiology tests were on the Meditech system, and that doctors on staff and outside the hospital ordered tests from the Radiology Department. She stated that in 1994, her department placed written, hard copies of radiology reports in a box for pickup for the doctors on staff, and it mailed written, hard copies of radiology reports via regular U.S. mail to doctors who were not on staff; and there was not a procedure in place to verify that each report was actually received by the requesting doctor. For urgent abnormal results, the radiologist was supposed to telephone the requesting doctor with the result.

33. The Plaintiffs' expert, Melissa Jarriel, testified by deposition that she has been employed by the Medical College of Georgia since 1994 as the Director of Health Information Management, and that she has a Bachelor of Science degree in Health Information Management and is a registered health information administrator. She has been working in the field for eighteen years; she has not, though, ever worked specifically in radiology.

34. Ms. Jarriel stated that she was hired to review the facts in this case and to arrive at any appropriate opinions. She reviewed the trial testimony, deposition testimony, CHCS operating manual, and Joint Commission standards applicable to hospitals. Based upon those standards, she testified that it is the hospital's duty to ensure that patient care and clinical information is transmitted to health care pro-

viders in a timely and accurate manner. She stated that the fact that the primary notification method for abnormal results was a telephone call from the radiologist to the requesting physician was proper, and that "the systems that were in place [at Beaufort Naval Hospital] were appropriate," but that there was a break down in the process. In Ms. Jarriel's opinion, Mrs. Smith's May 5, 1994, mammogram should have been coded as "abnormal," and the hospital should have had a procedure in place to periodically run a computer audit trail to determine the abnormal results in the computer system that had not been "opened and read," and then hospital personnel should have made telephone calls to advise the requesting physicians that abnormal results existed that had not yet been reviewed on-line. She stated that this procedure would have been an appropriate safety net during the transition phase to ensure that physicians knew about abnormal results. She admitted that if, during the transition phase to computers, the written, multi-part forms had been disseminated in the same manner as they had been before computers, that would have been appropriate procedure. She further admitted that there were always additional safety checks to any hospital's system of transmitting information that could conceivably, but not necessarily reasonably, be added.

35. Ms. Jarriel further testified that if a hospital changes the way information is disseminated, the hospital should notify all parties involved with the sending and receiving of this information. Ms. Jarriel opined that the hospital should have had a log in the Radiology Department for abnormal results to ensure that qualified individuals received the phone calls about the results, and that someone should "go back and double-check and make sure all the calls were made." However, she admitted that she did not know if it was general practice in community hospitals in May, 1994, for radiologists to maintain a log of contacts for abnormal results and to

check the log periodically, nor did she know whether her institution, the Medical College of Georgia, had such a log procedure in place in 1994.

36. The Defendant's expert, Kimberly Stavrinakis, testified by deposition that she currently works for the Medical University of South Carolina as the Manager of Support Services for the Radiology Department, and, as part of her duties, she oversees the radiology information system. She is a radiologic technologist and has a Masters degree in Health Administration, and she has worked in the field for twenty years. She was hired to review the facts in this case and to arrive at any appropriate opinions. She also relied on the February 16, 2000, Declaration of Anthony Swartz, which is attached as an exhibit to her deposition. Swartz's Declaration provided flow charts to demonstrate the flow of information in the Beaufort Naval Hospital during the precomputer, multi-part form system, the interim system for the transition to computers, and the final computer system, which is currently used.

37. Ms. Stavrinakis testified that it is the hospital's duty to have appropriate, reasonable procedures in place for the distribution of medical information. She reviewed the work flow process that was in place at Beaufort Naval Hospital, and she stated that it was essentially the same flow process that is maintained in many radiology departments in the country, including hers. One difference is that her hospital recommends that the radiologist indicate in the body of the report who was contacted with the abnormal result, but she explained that the reason for such procedure is legal accountability, and not for patient care. She believed that the interim system used at the Beaufort Naval Hospital was not a deviation from the standard of care because the hospital personnel did check periodically to make sure the sys-

tems—for example, printers—were working, and she felt that this was a reasonable procedure.

38. Ms. Stavrinakis explained that with the pre-computer, multi-part form system there were flaws because there was no assurances that the requesting physician actually received a specific person's test result and, with manual delivery, there are many things that could happen between the Radiology Department and the clinics. She stated that printing reports directly in the requesting clinics eliminates some places where things could go wrong. She further stated that the radiologist did not need to be told by the hospital that there were physicians not yet using the computer, because the appropriate systems were in place to ensure that those physicians were receiving the results, and a radiologist could assume those results were being delivered to the requesting physicians. She also felt that requesting providers have a responsibility to set up procedures or check so that they will be sure to receive the results they have ordered. Also, Ms. Stavrinakis mentioned that beginning in April of 1999, the Medical University of South Carolina mailed mammography letters to patients directly.

## CONCLUSIONS OF LAW

## GENERAL LEGAL PRINCIPLES.

1. This action was brought pursuant to the Federal Tort Claims Act (FTCA), 28 U.S.C. §§ 1346(b), 1402(b), 2401(b), and 2671–2680. The United States has waived its sovereign immunity only with respect to tort claims in which "... the United States, if a private person, would be liable to the claimant in accordance with the law of the place where the act or omission occurred." 28 U.S.C. § 1346(b).[1] The FTCA therefore does not create any substantive rights enforceable against the United States in suits for mon-

---

1. This waiver is restated in slightly different language later in the FTCA as follows: "The United States shall be liable, respecting the provisions of this title relating to tort claims, in the same manner and to the same extent as a private individual under like circumstances...." 28 U.S.C. § 2674.

ey damages; it merely adopts the substantive tort law "of the place where the act or omission occurred" as the rule of decision, subject to the exclusions and qualifications of the FTCA. Thus, the beginning point for analysis of the Plaintiffs' claims is whether the ultimate facts as alleged and proven would give rise to a cause of action against a private person under the laws of the state where the act or omission occurred. *Carlson v. Green,* 446 U.S. 14, 100 S.Ct. 1468, 1474, 64 L.Ed.2d 15 (1980); *Executive Jet Aviation, Inc. v. City of Cleveland,* 409 U.S. 249, 93 S.Ct. 493, 506, n. 25, 34 L.Ed.2d 454 (1972). In the present case, all alleged acts or omissions occurred in South Carolina, so the law of South Carolina must first be viewed in determining whether there can be any liability on the part of the United States.

■ 2. The Plaintiffs and Defendant disagree regarding the type of liability the Plaintiffs must prove to succeed on their negligence claims, the Plaintiffs contending that this is a simple negligence case, while the Defendant contends that the law of medical malpractice applies. This Court has reviewed several treatises and the general case law on this issue, and it appears that a plaintiff may state a negligence claim against a hospital for either simple negligence or medical malpractice, depending upon the circumstances and the nature of the conduct involved. *Corpus Juris Secundum* explains that "where the lack of due care may be discerned on the basis of common knowledge, the action sounds in simple negligence; if professional skill and judgment are involved, the more particularized theory of medical malpractice applies." 41 C.J.S. *Hospitals* § 24 (1991).

*American Jurisprudence* gives examples of simple negligence claims against a hospital; such as failure to prevent a patient's fall, mishandling of a cannister containing bone marrow cells, and mistakenly giving one patient another's HIV test results. 40A Am.Jur.2d *Hospitals and Asylums* § 57 (1999). On the other hand, it gives examples of malpractice claims against a hospital to include negligent selection and retention of physician, liability for the negligence of its professionals through the doctrine of respondeat superior, and negligent release of a patient resulting in another's wrongful death. *Id.*

3. Additionally in *American Jurisprudence* the following is found:

[T]he plaintiff must produce expert testimony with regard to the hospital's standard of care when the underlying issue involves the performance of medical procedures or a professional question.... However, the standard of non-medical, administrative, ministerial, or routine care in a hospital need not be established by expert testimony, because the jury is competent from its own experience to determine and apply such a reasonable-care standard. Expert testimony is also not required to support a claim against a hospital based on simple negligence.

*Id.* at § 59.

4. This Court, and the parties, attempted to find South Carolina case law on point, but it appears that no South Carolina appellate court has defined the boundaries of cases which constitute medical malpractice, as opposed to simple negligence claims, against a hospital.[2] The parties relied on cases from other jurisdictions

---

2. This Court located two South Carolina cases which provide guidance as to the types of claims that may be pursued against a hospital. In *Doe v. Greenville Hosp. Sys.,* 323 S.C. 33, 448 S.E.2d 564 (App.1994), a plaintiff sued the hospital for negligent hiring and negligent supervision of a male employee based upon his sexually assaulting a volunteer; and that claim did not sound in malpractice. In *Carver v. Medical Soc'y of S.C.,* 286 S.C. 347, 334 S.E.2d 125 (App.1985), a plaintiff sued Roper Hospital for negligence involving the procedures employed while an electrosurgery machine was in use during his surgery, and the Court stated that the procedures medical personnel should follow while the machine was in operation required expert testimony; it appeared that the plaintiff alleged medical malpractice, and the Court applied the medical malpractice theory of liability.

to support their asserted theory of liability. The Plaintiff cited an Indiana case on point which provides that,

"The manner in which reports of physicians and radiologists are recorded, and the channel through which the information is conveyed, are administrative matters. . . . It is the duty of the Hospital to adopt procedures which would ensure that the opinion of a radiologist showing the possibility of a severe injury would be immediately conveyed to the proper persons. Methodist Hospital is responsible for the negligent failure of its administrators to provide such a procedure."

*Keene v. Methodist Hosp.*, 324 F.Supp. 233, 234 (N.D.Ind.1971). The Defendant asserts that whether proper standards were followed in the handling of medical records is so related to the provision of medical care that such complaints fall under medical malpractice rules, relying on *Harvey v. Cramer*, 235 A.D.2d 315, 653 N.Y.S.2d 3 (1997). The Defendant argues that "conduct may be deemed malpractice, rather than negligence, when it constitutes medical treatment or bears a substantial relationship to the rendition of medical treatment by a licensed physician." *Scott v. Uljanov*, 74 N.Y.2d 673, 543 N.Y.S.2d 369, 541 N.E.2d 398, 399 (1989) (internal quotation marks omitted). The Defendant admits that a patient may be injured while being transported in an ambulance or by simply falling out of bed under circumstances that are sufficiently far from the provision of medical treatment that the conduct should be analyzed under normal negligence standards.

5. From this Court's research, it found that the Louisiana Court of Appeals held that, "[a] hospital has a duty to provide and maintain adequate facilities and supplies and a competent staff so as to provide competent care to its patients. . . . Yet hospitals are not insurers of their patients." *Sibley v. Board of Supervisors*, 490 So.2d 307, 311 (La.Ct.App.1986). In *Sibley*, the Court distinguished the claims

against the hospital related to the inappropriate medical records procedures and the inappropriate team treatment system, as procedures involved with the everyday running of the hospital, versus the allegations of negligence that related to medical treatment. *Id.* This Court also found several recent cases from other jurisdictions that demonstrate that the inquiry is whether the alleged negligence resulted from the hospital's medical functions or the hospital's provision of routine services to its patients; negligence resulting from medical functions requires expert proof, whereas negligence resulting from provision of routine services does not. *See Lane v. Tift County Hosp. Auth.*, 228 Ga. App. 554, 492 S.E.2d 317, 322 (1997); *Lamb v. Candler Gen. Hosp., Inc.*, 262 Ga. 70, 413 S.E.2d 720, 722 (1992); *McGraw v. St. Joseph's Hosp.*, 200 W.Va. 114, 488 S.E.2d 389, 396 (1997); and *Self v. Executive Comm., of Georgia Baptist Convention*, 245 Ga. 548, 266 S.E.2d 168, 169 (1980).

6. In a medical malpractice action in South Carolina, sometimes expert testimony is not required if the subject matter is of common knowledge or experience so that no special learning is needed to evaluate a person's conduct; however, in the great majority of malpractice cases a plaintiff must establish by expert testimony the standard of care and the defendant's failure to conform to that standard. *Carver v. Medical Soc'y of S.C.*, 286 S.C. 347, 334 S.E.2d 125, 127 (App.1985). In South Carolina, the elements that a plaintiff must prove to establish a medical malpractice claim are: the recognized and generally accepted standards and procedures which would be exercised by competent physicians—here, a hospital—under similar circumstances; that the physician and/or hospital personnel negligently deviated from the generally accepted standards and procedures; and that such negligent deviation from the generally accepted standards and procedures was a proximate cause of the

**574**

plaintiff's injury. *Andrews v. United States*, 548 F.Supp. 603, 610 (D.S.C.1982), *aff'd* 732 F.2d 366 (4th Cir.1984).

■ 7. In South Carolina, the elements a plaintiff must prove to establish a simple negligence claim are: a duty of care owed by the defendant; a breach of that duty by an act or omission or commission; and damage proximately caused by the breach. *Kleckley v. Northwestern Nat'l Cas. Co.*, 338 S.C. 131, 526 S.E.2d 218, 221 (2000).

## THE PLAINTIFFS' ACTION AGAINST HOSPITAL EMPLOYEES.

8. This Court finds that it is not necessary for it to decide whether the Plaintiffs must proceed under a medical malpractice or simple negligence legal theory because the Court feels that the Plaintiffs' claims fail under either theory as explained herein. Moreover, whether expert testimony is required to prove the hospital's duty of care and breach of that duty under either legal theory is not an issue because this Court previously determined that it would be beneficial to the Court to hear testimony from a person with specialized knowledge of hospital administration and radiology records delivery procedures. *See* Fed. Rule Evid. 702. Thereafter, the Court received pertinent evidence which it has considered under both legal theories.

9. The Federal Tort Claims Act has its own built-in limitation on liability for independent contractor negligence. The Fourth Circuit Court of Appeals has in a relatively recent case discussed this limitation on liability and decided in favor of the government on facts remarkably like the present case. In *Robb v. United States*, 80 F.3d 884 (4th Cir.1996), a family practice doctor was working for a company which was providing a family practice clinic for the Air Force pursuant to a Partnership Memorandum of Understanding, and a radiologist was providing radiographic interpretation services for the Air Force hospital by virtue of a contract. The plaintiff in *Robb* was complaining about a delayed diagnosis of lung cancer. The only substantial difference between *Robb* and this case is that in *Robb* the complaint concerned an alleged failure to properly interpret the x-ray film, while the present case involves a failure of the radiologist to properly convey the results to the family practice doctor. The Court held that the family practice doctor and the radiologist were independent contractors, not federal employees, and the United States could not be liable for any of their acts or omissions.

10. In the present action, the Plaintiffs have **not** contended that the government can be liable based upon any negligent act or omission on the part of Dr. Gilbert, the Family Medicine Clinic employees, or Dr. Sherbert; instead, the Plaintiffs contend that the employees of the Beaufort Naval Hospital were negligent and that their negligence was a contributing proximate cause of the Plaintiffs' injuries. The Fourth Circuit Court of Appeals held in *Berkman v. United States*, 957 F.2d 108, 113 (4th Cir.1992), that the fact that an independent contractor may have some responsibility for the injuries to a plaintiff cannot be viewed as relieving the United States of liability where federal employees may have caused or contributed to the alleged tort. Accordingly, for the Plaintiffs to succeed against the Defendant, they were required to prove by a preponderance of the evidence that a radiology technician, or other hospital employee, breached the duty of care owed to the Plaintiffs and proximately contributed to Mrs. Smith's injuries.

11. All parties agree that a computer system print-out failure most likely occurred on or about May 5, 1994, which caused Mrs. Smith's mammogram result not to print at the Family Medicine Clinic. However, the Plaintiffs do **not** contend that the Defendant is responsible for such a computer system failure since an independent contractor implemented the computer system.

## THE HOSPITAL'S RECORDS DELIVERY PROCEDURE DURING THE TRANSITION PHASE TO COMPUTERS.

12. The Plaintiffs' first allegation of negligence is that the hospital failed to have an adequate procedure in place for delivery of radiological reports during the transition phase from hand-delivery to computers that would ensure that physicians ordering radiological reports would timely receive the results.

13. During the transition phase, for the doctors who were not yet using the computer to retrieve radiological results, the hospital had a reporting system for abnormal results that contained (1) a primary requirement for the radiologist to telephone the doctor who ordered the test, and (2) a computer system that automatically printed the test results in the requesting clinic, as a backup for the telephone call. Furthermore, it was reasonable for the hospital to assume that an ultimate, last line safety feature was the inherent interest of the doctor in obtaining the results of the test he ordered.

14. This Court finds that the hospital had a duty to implement a reasonable procedure during the transition phase to computers which would timely deliver radiology test results to requesting physicians, and that it did not breach that duty. This Court's conclusion that the Beaufort Naval Hospital satisfied its duty to implement a reasonable procedure during the transition phase is in accordance with Ms. Stavrinakis' testimony that Beaufort Naval Hospital's flow process that was in place to distribute test results during the transition phase was essentially the same that exists in many radiology departments in the country, including hers. The hospital's requirement that the radiologist telephone the requesting doctor when results were abnormal was a mandatory requirement that should have been followed, and it was reasonable for the hospital to expect that radiologists would do so. This Court agrees with Ms. Stavrinakis that the procedure during the transition phase was also appropriate, in part, because the hospital employees periodically checked to ensure that the printers were working at the various clinics. This Court further finds that the transition procedure which required the computer to automatically print radiology results once a day in the Family Medicine Clinic was an adequate replacement for the pre-computer, pick-up of written reports by Family Medicine Clinic runners; under the pre-computer system and the transition system, the Radiology Department could not be certain that the requesting physician actually received a hard copy of each test report. The computer was supposed to automatically print the results directly to the printer in the Family Medicine Clinic, and it was reasonable for Beaufort Naval Hospital to assume that the results were printed each day unless they were notified to the contrary.

15. Beaufort Naval Hospital's transition procedure was similar to Beaufort Memorial Hospital's procedure in that the radiology departments at both hospitals could not be certain that requesting doctors actually received a hard copy of test results they had ordered. Ms. Brownlee explained that all requesting physicians did not use the Meditech computer system, and that Beaufort Memorial Hospital distributed hard copies of test results to requesting doctors by leaving a report in a pick-up box for on staff doctors, or mailing it via regular U.S. Mail to doctors not on staff; there was not a procedure in place to verify that each report was actually received by the requesting doctor. For urgent abnormalities, the radiologists at Beaufort Memorial Hospital were directed to call the requesting physician to immediately notify him about the result, similar to Beaufort Naval Hospital's requirement.

16. Since this Court found as a fact that neither Dr. Gilbert, a family medicine physician, nor Dr. Sherbert, a radiologist, established any expertise in regard to proper utilization of computers in support

of medical records delivery nor did they establish themselves as experts in hospital administration, it has chosen not to give any weight to their opinions that the hospital's records delivery procedure during the transition phase was inappropriate. As previously stated, both Dr. Gilbert and Dr. Sherbert had a motive to blame the hospital procedures for the error that occurred to distract from their own likely negligent acts. This Court further rejects Dr. Gilbert's opinion that the Beaufort Naval Hospital did not have appropriate procedures in place simply because he did not receive a hard copy of Mrs. Smith's result for the reason that such conclusion requires application of the doctrine of *res ipsa loquitur*, and this legal principle is not followed in South Carolina. *Crider v. Infinger Transp. Co.*, 248 S.C. 10, 148 S.E.2d 732, 734 (S.C.1966); *Nguyen v. Uniflex Corp.*, 312 S.C. 417, 440 S.E.2d 887 (App.1994). The fact that Dr. Gilbert did not timely receive Mrs. Smith's May 5, 1994, result is not, by itself, evidence that Beaufort Naval Hospital was negligent.

17. For several reasons, this Court rejects Ms. Jarriel's opinion that Beaufort Naval Hospital should have had another safety check in place during the transition phase, that is, the hospital should have periodically run a computer audit trail to determine the results in the computer that were coded "abnormal" that had not yet been "opened and read," and then hospital personnel should have made telephone calls to advise the requesting physicians that abnormal results existed that they had not yet reviewed. Such an audit trail requirement would have been an additional safety check, but as Ms. Jarriel admitted, such check, though not reasonably required, can always be added to any hospital's records delivery system. Notably, Ms. Jarriel admitted that if, during the transition phase, the written, multipart forms had been disseminated in the same manner as they had been before computers, that would have been appropriate procedure. This Court finds that the procedure which required the computer to automatically print radiology results once a day in the Family Medicine Clinic was an adequate replacement for the pre-computer pick-up of written reports by Family Medicine Clinic runners.

18. This Court finds that Ms. Jarriel's recommended audit trail was not required under the standard of care applicable to hospitals in 1994; it finds that Ms. Stavrinakis' explanation of the standard of care is more logical and credible; therefore, Beaufort Naval Hospital's records delivery procedure during its transition phase, which was not a deviation from the standard of care as described by Ms. Stavrinakis, was appropriate and constituted due care under the circumstances.

■ 19. Furthermore, under the common law standard of due care, Beaufort Naval Hospital had the duty to implement a records delivery procedure during its transition phase that a hospital using ordinary prudence and reason would utilize under the same circumstances. *See Epps v. United States*, 862 F.Supp. 1460, 1463 (D.S.C.1994); *Hart v. Doe*, 261 S.C. 116, 198 S.E.2d 526, 529 (1973). Beaufort Naval Hospital did not have the duty to utilize a records delivery procedure during its transition to computers that the most careful hospital would have used—which, for example, may have required requesting physicians to sign off upon receipt of each radiology report, or may have required audit trails to be generated; instead, it was bound to install procedures that a hospital using ordinary care and diligence would have. This Court finds that Beaufort Naval Hospital's transition procedure was a procedure that a hospital using ordinary prudence and reason would have implemented. Although Beaufort Naval Hospital could not be certain that requesting physicians actually received a hard copy of each report, it was reasonable to expect that the radiologists would follow the mandatory requirement that the requesting physicians be telephoned for each abnormal result. The Court finds that a

hospital using reasonable care and prudence would have believed that the records delivery procedure in place during the transition phase was sufficient to timely relay abnormal, and normal, results to requesting physicians.

20. The Plaintiffs point to a November 2, 1994, order issued by the commander at the Beaufort Naval Hospital, which stated that CHCS had inherent problems that needed to be corrected, as evidence of negligence. This Court finds that this order is not evidence of negligence; it merely is some evidence that Beaufort Naval Hospital realized that its records delivery transition procedure was not perfect, which, as this Court held, was not required, and the order indicates the hospital's desire for the transition procedure to work without any errors.

21. Even if the Plaintiffs had proved that Beaufort Naval Hospital's records delivery transition procedure was negligent for its failure to include an audit trail safety check for results coded "abnormal," the hospital's failure to have such an audit trail could not have been a proximate cause of Mrs. Smith's injuries here. Dr. Sherbert had not properly coded the result as "abnormal," and even if an audit trail report had been generated, Mrs. Smith's May 5, 1994, result would not have been listed as an "abnormal" result in the computer that had not been "opened and read;" therefore, the hospital employees would not have had any cause to telephone Dr. Gilbert to advise him of Mrs. Smith's pending "abnormal" result in the computer.

### THE HOSPITAL'S FAILURE TO INFORM DR. SHERBERT THAT ALL PROVIDERS WERE NOT ON–LINE.

22. The Plaintiff's second allegation of negligence is that on April 18, 1994, when the Radiology Department began entering test results into the computer and discontinued the written multi-part form, the hospital employees in charge of the transition failed to inform Dr. Sherbert, the radiologist, that all physicians were not yet on the computer system. Ms. Jarriel stated that the Beaufort Naval Hospital should have notified all parties involved with sending and receiving information that the method of disseminating information had changed. The Plaintiffs argue that had Dr. Sherbert known that all physicians were not on-line, he would have made a special point to telephone the Family Medicine Clinic at a later date to follow-up with Dr. Gilbert, and Dr. Sherbert testified to that effect. The following factual situation cast doubt on this testimony by Dr. Sherbert.

23. He testified that, in his mind, he had complied with the hospital's procedure to telephone the requesting physician, and he said that he told the person at the Family Medicine Clinic that it was important for Dr. Gilbert to contact him. It is reasonable to conclude that Dr. Sherbert thought that he had left the "ball in Dr. Gilbert's court," because Dr. Gilbert was to call Dr. Sherbert back. Moreover, and most importantly, Dr. Sherbert "lined out" his responsibility to call Dr. Gilbert in his personal log, and Dr. Sherbert had a motive to shift the blame away from himself when he made that statement. Also telling is Dr. Gilbert's statement that upon learning of the incident, he spoke with Dr. Sherbert to inquire why he had not received the May 5, 1994, mammogram result, and Dr. Sherbert said that he had just forgotten to call Dr. Gilbert personally.

24. This Court agrees with Ms. Stavrinakis that Beaufort Naval Hospital did not have a duty to inform Dr. Sherbert that all physicians were not yet on-line because it had put a reasonable procedure in place so that those physicians who were not yet on-line would receive a print-out of test results each day in their own clinics. The Court finds Ms. Stavrinakis' opinion regarding the standard of care more logical and reasonable than Ms. Jarriel's, and it further finds that the use of due care did

not require the hospital to inform Dr. Sherbert as to the procedures for disseminating information provided a reasonable procedure was in place. Moreover, in the exercise of due care, Dr. Sherbert should have followed Beaufort Naval Hospital's mandatory requirement that he telephone Dr. Gilbert with the abnormal result, whether or not Dr. Gilbert was on-line.

## RADIOLOGISTS' DUTY TO MAINTAIN A LOG OF ABNORMAL RESULTS.

■ 25. The Plaintiffs' third claim of negligence is that the hospital should have required radiologists to keep a log of their phone calls to requesting physicians of abnormal test results. Ms. Jarriel opined that the Defendant's hospital should have had such a log to ensure that the phone call was received by qualified individuals, and that someone should "go back and double-check and make sure all the calls were made." However, she did not know if it was general practice in community hospitals in May, 1994, for radiologists to maintain a log of contacts for abnormal results and to check the log periodically to determine if all abnormal results had been telephoned, nor did she know whether the Medical College of Georgia in 1994 maintained and checked such a log. Ms. Stavrinakis testified that at her hospital in 1994 it was recommended, but not required, that radiologists log their phone calls to requesting physicians within the body of the report for legal accountability reasons, but not for patient care reasons.

26. Here, this Court does not find that Ms. Jarriel's opinion is logical or reasonable and the Court finds that it was not negligent or a deviation from the standard of care in 1994 for Beaufort Naval Hospital not to have such a log in place, and it finds that Beaufort Naval Hospital's failure to maintain such a log was not due to a lack of due care under the circumstances. Moreover, assuming there had been a procedure to require Dr. Sherbert to sign such a log, he testified that after speaking with someone at the Family Medicine Clinic, he would have signed the log. There is no evidence as to whom Dr. Sherbert spoke with at the Family Medicine Clinic or whether they were "qualified" to receive the information. This Court finds that, even if the Radiology Department had checked the log to determine if all calls of abnormal results were telephoned to qualified individuals, under the circumstances here it is more likely than not that nothing more would have been done with Mrs. Smith's result that would have ensured that Dr. Gilbert received it.

## THE HOSPITAL'S EMPLOYEES' DUTY TO NOTICE AND CORRECT THE COMPUTER PRINT-OUT FAILURE.

27. The Plaintiffs' fourth allegation of negligence is that the hospital employees failed to notice and correct the computer print-out failure that occurred on or around May 5, 1994, when Mrs. Smith's report was not printed in the Family Medicine Clinic. The testimony established that the hospital employees in charge of checking printers in the clinics did so on a periodic basis but they were dependent on the clinics to call if, on a specific occasion, nothing printed.[3] There is no testimony in the record that anyone from the Family Medical Clinic noticed a printer problem on or around May 5, 1994, and notified the Radiology Department about it. Therefore, this Court finds that the hospital employees did not have notice of, and did not fail to correct, a print-out failure on or about May 5, 1994.

## MRS. SMITH'S MAY 5, 1994, MAMMOGRAM CODED AS "SEE REPORT TEXT."

■ 28. The Plaintiffs' fifth allegation of negligence is that the radiology technician, an employee of the Defendant, should have coded Mrs. Smith's report as "abnormal" instead of "see report text," and, during the transition phase, the hospital should have periodically run computer audit trail reports to determine which abnor-

---

3. As previously noted, this Court finds that this hospital procedure was reasonable.

mal results in the computer had not been "opened and read;" then hospital employees should have telephoned the requesting physicians to make sure they knew of those abnormal results.[4]  The CHCS record of the May 5, 1994, mammogram shows that at 12:07 p.m. the report results were transcribed into the computer, and that at 12:10 p.m. the same day Dr. Sherbert approved the report.  Dr. Sherbert testified that it was his responsibility to dictate the text of the report and the result code, not the radiology technicians' responsibility.  He further stated that he felt fairly certain that he would have personally verified Mrs. Smith's May 5, 1994, mammography report because it was a major abnormality.  Mr. Freeman also testified that it was the radiologist's decision as to what result code to place on a report.  This Court finds that it was ultimately Dr. Sherbert's responsibility to ensure that Mrs. Smith's May 5, 1994, mammogram result was coded as "abnormal," and, therefore, the radiology technicians and transcriptionists did not fail in any duty to code the report as "abnormal."

*RADIOLOGY DEPARTMENT'S FAILURE TO MANUALLY PRINT MRS. SMITH'S MAY 5, 1994, RESULT.*

■  29.  The Plaintiffs' sixth allegation of negligence is that the employees of the Radiology Department failed to manually print Mrs. Smith's May 5, 1994, test result and place it in the file kept in the Radiology Department.  This Court finds that because the report printed in Radiology and placed in the file in that department played no role in communicating the test result to the requesting doctor, the fact that Mrs. Smith's report was not printed by Radiology on or about May 5, 1994, could not have proximately caused her alleged injuries.  It is not reasonable to assume that a Radiology Department employee's failure to print Mrs. Smith's report and place it in her file in that

department would have in any way been communicated to Dr. Gilbert or would have prompted any hospital employee to contact Dr. Gilbert to question whether he had received the test result; thus, this Court disagrees with the Plaintiff's assertion that had the report been properly printed in the Radiology Department that would have been a safety check or opportunity for action.

*RADIOLOGY STAFF SHOULD NOT HAVE ADVISED MRS. SMITH TO ASSUME MAMMOGRAM WAS NORMAL, AND THE HOSPITAL SHOULD HAVE DIRECTLY NOTIFIED HER AS TO THE RESULTS.*

■  30.  The Plaintiffs' seventh allegation of negligence is two-fold—the hospital was negligent for its failure to have a procedure in place in 1994 to directly notify patients concerning their mammogram results, and the radiology staff should not have advised Mrs. Smith that she could assume her mammogram was normal if she did not hear anything in a few days.  Mrs. Smith testified that on May 5, 1994, "they" told her that they would send the results of the mammogram to her physician and if she did not hear anything within three to four days she could assume it was normal.  This Court cannot determine whether the radiology staff, or the radiologist, so advised Mrs. Smith.  Taking the facts in the light most favorable to the Plaintiffs, it will assume that she meant the radiology staff, for whom the Defendant is responsible.

31.  Dr. Gilbert testified that the hospital in 1994 should have had a procedure to send patients a card directly to notify them of their mammogram results; however, on cross-examination, he admitted that he was not offering an opinion that the hospital deviated from accepted medical standards in 1994 by failing to mail cards directly to patients.  When asked if he had ever advised patients to assume their

4.  As previously noted, this Court finds that the lack of this additional safety check did not indicate a lack of due care on the part of Beaufort Naval Hospital.

mammogram was normal if they had not heard anything in three to four days, Dr. Gilbert stated "no;" when asked "would that be a deviation from accepted medical standard to advise a patient of that?" he answered "in my opinion." This Court cannot determine whether he meant that it would be a deviation from accepted medical standard for him to advise patients to assume the result was normal, or whether he meant it would be a deviation from accepted medical standard for the hospital to so advise patients. Taking the facts in the light most favorable to the Plaintiffs, it will assume that he meant the hospital, for whom the Defendant is responsible.

32. Dr. Sherbert testified that in 1994, there was no procedure at Beaufort Naval Hospital to send mammography results to patients directly. When asked if there should have been such a procedure, he stated that after the Mammography Quality Standard Act was passed it was mandated by the government to do so and it is an excellent policy. He believed that the Act passed in 1995, and everything changed after that date. This Court finds that he did not offer an opinion that the hospital failed to exercise due care by its not having such a procedure in place in 1994.

33. Ms. Stavrinakis testified that beginning in April of 1999, the Medical University of South Carolina mailed mammography letters to patients directly.

34. This Court has reviewed the Mammography Quality Standards Act of 1992, 42 U.S.C. § 263b, which was amended in 1998. It appears that the 1998 amendments required that patients be sent directly a summary of their mammogram results, but that the 1992 Act did not require direct patient notification for all patients. This Court finds that on May 5, 1994, it was not mandated by the government that hospital radiology departments notify patients directly concerning their mammogram results.

35. The Plaintiffs, who have the burden of proof, did not present sufficient testimony to prove that in 1994, hospital radiology departments should have directly notified patients concerning their mammogram results, either because it was accepted medical practice to do so or because due care required it. Dr. Gilbert was the only witness who opined that the Beaufort Naval Hospital was negligent for its failure to mail results directly to patients in 1994, although he stated that he was not offering an expert opinion on that issue. He also stated that if Mrs. Smith was advised to assume her result was normal if she did not hear anything within three to four days that would be a deviation from accepted medical practice. However, as this Court previously explained herein, Dr. Gilbert was not established as an expert in hospital administration or records delivery procedures, and he had a motive to blame the hospital procedure for the error that occurred to distract from his own likely negligent acts and omissions.

36. No one testified that in 1994, other hospitals directly notified patients concerning their mammogram results.

37. Based on the testimony offered on this issue of negligence, and the lack thereof, and the Mammography Quality Standards Act of 1992, this Court finds that a hospital using ordinary prudence and reason in 1994, would not have mailed notification of mammogram results directly to patients. Moreover, since Beaufort Naval Hospital had appropriate procedures in place in 1994, for the transmission of radiology medical records to requesting physicians, due care did not require that it directly notify patients concerning their mammogram results. As a corollary, this Court finds that it was not negligent for radiology staff to advise Mrs. Smith that if you have not heard anything within three or four days the result is normal. Because the radiology staff knew that patients' doctors would quickly receive serious abnormal mammogram results, this Court feels that it was not inappropriate to advise

patients to assume everything is normal unless notified otherwise.

## CONCLUSION

As heretofore stated, in South Carolina, a plaintiff attempting to prove negligence cannot rely on *res ipsa loquitur* because that doctrine is not recognized. *Crider v. Infinger Transp. Co.,* 248 S.C. 10, 148 S.E.2d 732, 734 (1966): *Nguyen v. Uniflex Corp.,* 312 S.C. 417, 440 S.E.2d 887 (App. 1994). In this case, the fact that Dr. Gilbert did not receive Mrs. Smith's May 5, 1994, mammogram test result on a timely basis and Mrs. Smith's resulting injuries is not evidence in and of itself that the hospital was negligent—although it certainly indicates that someone was negligent. The Plaintiffs had to prove by a preponderance of the evidence that the Defendant owed a duty to the Plaintiffs which it breached and proximately caused them injury, and the Plaintiffs did not carry their burden under a simple negligence or medical malpractice legal theory. Although the Plaintiffs' case is a very sympathetic one because it does appear that someone was negligent, this Court cannot find in their favor here based on sympathy when it has concluded that none of the Defendant's employees or agents were negligent.

Based on the foregoing, it is

ORDERED that this Court finds in favor of the Defendant, and the Clerk of Court shall enter judgment accordingly, with each party to bear their own costs.

**IT IS SO ORDERED.**